**Oral Argument Not Yet Scheduled**

No. 14-3089

———————————

IN THE
**UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———————————

**UNITED STATES OF AMERICA,**

*Appellee,*

v.

**DONNELL CREWS,**

*Appellant.*

———————————

**On Appeal from the United States District Court
for the District of Columbia**

———————————

**BRIEF FOR APPELLANT**

———————————

**Charles B. Wayne**
**Jerald R. Hess**
**DLA PIPER LLP (US)**
**500 8th Street, N.W.**
**Washington, D.C. 20004**
**(202) 799-4253**
**(202) 799-5253 (fax)**
**charles.wayne@dlapiper.com**
**j.hess@dlapiper.com**

***Counsel for Appellant***
***(Appointed by this Court)***

## CERTIFICATE AS TO PARTIES,
## RULINGS, AND RELATED CASES

### A. Parties and Amici

This appeal arises from a criminal prosecution of Donnell Crews by the United States of America.  There are no intervenors or amici.

### B. Rulings Under Review

Appellant Crews seeks review of the following rulings of the district court (the Honorable Emmet G. Sullivan):

- striking the entire testimony of the only defense witness after that witness invoked her Fifth Amendment privilege against self-incrimination in response to questions related to her credibility (3/5/14 Tr. 114; 3/6/14 Tr. 13-14[1]); and

- denying defendants' motion for a mistrial after a government witness provided improper, graphic testimony that violated a joint stipulation of the parties (2/20/14 Tr. 122-23).

### C. Related Cases

This case has not previously been before this Court.  There are no related cases.

---

[1]  The trial transcript is not consecutively paginated, and all trial and other transcripts are referred to by date.  All referenced pages are contained in the Appendix ("App.").

i

# TABLE OF CONTENTS

**Page**

JURISDICTION..................................................................................1

STATUTES AND RULES ...................................................................1

ISSUES PRESENTED.........................................................................1

STATEMENT OF THE CASE.............................................................2

    A. The First Trial .............................................................................2

        1. The Government's Case-in-Chief, Including the Testimony of
           Joseph Brennan.................................................................3

        2. Crews' Defense Relies Primarily on Just One Witness: Vakeema
           Ensley .............................................................................4

        3. The Trial Results in a Hung Jury on All Counts .....................6

    B. The Second Trial..........................................................................6

        1. The Government Puts on a Nearly Identical Case in Chief Except
           that Brennan's Testimony is More Graphic ...............................7

        2. Crews Calls Only One Witness – Ensley – But the District Court
           Strikes Her Entire Testimony and Tells the Jury to Disregard It.............8

        3. The Jury is Again Unable to Reach a Unanimous Verdict on Four
           of the Seven Counts, but Convicts Crews of Attempted Robbery.........11

SUMMARY OF ARGUMENT ...........................................................12

ARGUMENT .....................................................................................13

I.  THE DISTRICT COURT ABUSED ITS DISCRETION BY STRIKING ENSLEY'S
    ENTIRE TESTIMONY ..................................................................13

    A. The District Court Applied the Wrong Legal Standard When Striking
        Ensley's Entire Testimony...........................................................14

        1. Under the *Cardillo* Standard, a Court May Not Strike a Witness'
           Entire Testimony When the Witness Refuses to Answer Questions
           that Address Collateral Issues ...............................................14

        2. The District Court Failed to Apply the *Cardillo* Standard and
           Failed to Consider Whether the Questions Ensley Refused to
           Answer Were Collateral in Nature .........................................17

    B. Had the District Court Applied the Correct Legal Standard, Ensley's
         Entire Testimony Would Not Have Been Stricken .....................19

C.  There Were at Least Three Alternative Remedies Available to the District Court that Would Not Have Violated Crews' Constitutional Rights .........................................................................................21

II.  THE DISTRICT COURT ABUSED ITS DISCRETION BY DENYING DEFENDANTS' MOTION FOR A MISTRIAL AFTER BRENNAN'S GRAPHIC TESTIMONY REGARDING DEAN'S "BRAIN MATTER." ...............................................24

A.  Legal Standard .............................................................................24

B.  Brennan's Graphic Testimony Regarding Dean's "Brain Matter" Was Highly Prejudicial When Compared with the Limited Evidence Linking Crews to the Attempted Robbery....................................26

C.  The District Court's Jury Instruction Did Not Ameliorate the Prejudice ........................................................................................28

CONCLUSION .......................................................................................29

ADDENDUM ...................................................................................... A-1

# TABLE OF AUTHORITIES

Page(s)

C ASES

*Bruton v. United States*,
    391 U.S. 123 (1968)..................................................................28

*\*Burke v. Harman*,
    574 N.W.2d 156 (Neb. Ct. App. 1998)......................................16, 20

*Carlos v. Wyrick*,
    753 F.2d 691 (8th Cir. 1985) ...................................................15

*Commonwealth v. Funches*,
    397 N.E.2d 1097 (Mass. 1979) ................................................19

*Crane v. Kentucky*,
    476 U.S. 683 (1986)................................................................13

*Fountain v. United States*,
    384 F.2d 624 (5th Cir. 1967) ..................................................19

*In the Interest of J.D.S.*,
    436 N.W.2d 342 (Iowa 1989) ..................................................19

*Jackson v. State*,
    695 P.2d 227 (Alaska Ct. App. 1985).......................................19

*Johnson v. United States*,
    418 A.2d 136 (D.C. 1980) .......................................................19

*Krulewitch v. United States*,
    336 U.S. 440 (1949)................................................................29

*Lawson v. Murray*,
    837 F.2d 653 (4th Cir. 1988) ..................................................21

*Linder v. Dep't of Justice*,
    133 F.3d 17 (D.C. Cir. 1998)...............................................14, 19

*Nash v. United States*,
    54 F.2d 1006 (2d Cir. 1932) ...................................................29

_____

\* Authorities on which appellant principally relies are marked with an asterisk.

*People v. Chin*,
    490 N.E.2d 505 (N.Y. 1986)................................................................19

*People v. Coca*,
    564 P.2d 431 (Colo. 1977)................................................................19

*People v. Fuzi*,
    323 N.W.2d 354 (Mich. 1982)................................................................19

*Robertson v. State*,
    765 S.W.2d 936 (Ark. 1989) ................................................................19

*Rock v. Arkansas*,
    483 U.S. 44 (1987)................................................................13

*Schnelle v. State*,
    103 S.W.3d 165 (Mo. Ct. App. 2003) ................................................................15

*Smith v. State*,
    168 S.E.2d 587 (Ga. 1969) ................................................................19

*State v. Brown*,
    549 S.W.2d 336 (Mo. 1977) ................................................................14, 19

*State v. Dunlap*,
    608 P.2d 41 (Ariz. 1980) ................................................................19

*State v. Iron Thunder*,
    272 N.W.2d 299 (S.D. 1978)................................................................19

*State v. Montanez*,
    523 P.2d 410 (Kan. 1974)................................................................19

*State v. Pickens*,
    615 P.2d 537 (Wash. Ct. App. 1980)................................................................19

*State v. Ray*,
    444 S.E.2d 918 (N.C. 1994)................................................................19

*State v. Rogers*,
    453 P.2d 593 (N.M. Ct. App. 1969) ................................................................19

*State v. Spencer*,
  248 N.W.2d 915 (Minn. 1976) ...........................................................19

*Thomas v. State*,
  63 492 A.2d 939 (Md. 1985) ..............................................................19

*Turner v. Fair*,
  617 F.2d 7 (1st Cir. 1980)...................................................................19

*United States v. Cardillo*,
  316 F.2d 606 (2d Cir. 1963) ............................................... 15, 16, 18, 20, 21, 22

*United States v. Daniels*,
  770 F.2d 1111 (D.C. Cir. 1985)..........................................................29

*United States v. Eccleston*,
  961 F.2d 955 (D.C. Cir. 1992)..........................................24, 25, 26, 27

*United States v. Esparsen*,
  930 F.2d 1461 (10th Cir. 1991) ...................................................15, 18

*United States v. Gomez-Pabon*,
  911 F.2d 847 (1st Cir. 1990)..............................................................25

*United States v. Hirst*,
  668 F.2d 1180 (11th Cir. 1982) .........................................................19

*United States v. Humphrey*,
  696 F.2d 72 (8th Cir. 1982) ...............................................................20

*United States v. Negrete Gonzales*,
  966 F.2d 1277 (9th Cir. 1992) ......................................15, 17, 18, 21

*United States v. Newman*,
  490 F.2d 139 (3rd Cir. 1974) .............................................................19

*United States v. Smith*,
  342 F.2d 525 (4th Cir. 1965) .............................................................19

*United States v. Stephens*,
  492 F.2d 1367 (6th Cir. 1974) ...........................................................19

*United States v. Tarantino*,
    846 F.2d 1384 (D.C. Cir. 1988) .........................................................25

*United States v. Treacy*,
    639 F.2d 32 (2d Cir. 2011) .................................................................20

*United States v. Wilkins*,
    742 F.3d 354 (8th Cir. 2014) ................................................14, 15, 18

*United States v. Wilson*,
    605 F.3d 985 (D.C. Cir. 2010) .........................................................14

*United States v. Zapata*,
    871 F.2d 616 (7th Cir. 1989) ...........................................................18

## STATUTES

18 U.S.C.

    § 922(g) ...............................................................................................3

    § 924(c) ...............................................................................................3

    § 1951 ..................................................................................................3

## CONSTITUTIONAL PROVISIONS

U.S. Const. amend. V ...........................................................1, 10, 15

U.S. Const. amend. VI .................................................................13

U.S. Const. amend. XIV ...............................................................13

## JURISDICTION

The Court has jurisdiction of this appeal under 28 U.S.C. § 1291, 18 U.S.C. § 3742(a), and Federal Rules of Appellate Procedure 3 and 4.  The district court imposed sentence on Crews on December 16, 2014, and judgment was entered on the same day.  App. 65-71.  Crews filed a timely notice of appeal on December 17, 2014.  App. 72.

## STATUTES AND RULES

Pertinent statutes and rules are set forth in the addendum.

## ISSUES PRESENTED

1. Whether the district court abused its discretion by striking the entire testimony of Vakeema Ensley where:

  a. Ensley was the only witness for Crews and was his entire defense;

  b. Ensley's direct testimony covered a number of different topics; one small portion of her direct testimony related to whether she previously had a phone conversation with Antwon Crowder, a topic that was not relevant to any element of the government's case-in-chief;

  c. during cross examination, the government intended to impeach Ensley by playing a recorded phone conversation that arguably contradicted her prior testimony regarding whether she previously spoke with Crowder;

  d. Ensley then invoked her Fifth Amendment privilege against self-incrimination and refused to answer questions regarding the recorded phone conversation; and

     e. as a result, the district court struck the entirety of Ensley's testimony even though there were several alternative remedies available that would not have deprived Crews of his constitutional rights to call witnesses and to present a defense.

2. Whether the district court abused its discretion by denying defendants' motion for a mistrial after a government witness improperly testified that he saw "brain matter" while attempting to assist an injured person where the parties had stipulated that the person's death was not relevant and the circumstances surrounding that person's death were not to be discussed in front of the jury.

## STATEMENT OF THE CASE

### A. The First Trial

On September 21, 2011, several men, including Kirk Dean and Anthony James, attempted to rob the employee of an armored truck company as he walked back to the truck from a CVS drug store. It is undisputed that gunshots were fired and that the employee returned fire with his own gun. 7/22/13 Tr. 113. It is also undisputed that Dean was shot during the attempted robbery. 7/18/13 Tr. 42. The parties stipulated, however, that Dean died of unrelated gunshot wounds and that his death was not connected to the attempted robbery. 7/24/13 Tr. 230-31. Indeed, the parties went to great lengths to ensure that no witness testified as to the circumstances of Dean's death. 8/1/13 Tr. 185-87.

On December 20, 2011, the government obtained an indictment against Antwon Crowder and Donnell Crews. The indictment included three charges

2

against both defendants and one additional charge against Crews. The three charges against both defendants were for conspiracy to affect interstate commerce by robbery in violation of 18 U.S.C. § 1951; attempted interference with interstate commerce by robbery in violation of 18 U.S.C. § 1951; and use of a firearm in furtherance of a crime of violence, in violation of 18 U.S.C. § 924(c). App. 58-62. Because Crews had a prior firearm conviction, the indictment included a fourth count against him for unlawful possession of a firearm in violation of 18 U.S.C. § 922(g). App. 61.

## 1. The Government's Case-in-Chief, Including the Testimony of Joseph Brennan.

At trial, the government sought to prove that Dean, James, and Crews attempted to rob the employee as he walked back to the armored truck from the CVS while Crowder waited nearby in a getaway car. 2/11/14 Tr. 160-65. The getaway car, according to the government, belonged to Vakeema Ensley, Crews' fiancée. 2/11/14 Tr. 168.

The government attempted to link Crews and Crowder to the attempted robbery through James, who had pled guilty and agreed to cooperate. 7/29/13 Tr. 145. James, who is Crews' half-brother, testified that the four individuals conspired to rob the armored truck and met the morning of September 21 in order to do just that. 7/29/13 Tr. 140-48. He further testified that while Crowder waited around the corner in the getaway car, Dean and Crews walked to the CVS and

James followed behind them.  7/29/13 Tr. 197.  According to James, he then heard gunshots come from the CVS and so he ran back to the getaway car.  7/29/13 Tr. 197.  Several moments later, according to James, Dean and Crews also returned to the car.  7/29/13 Tr. 201.  James testified that Dean had been shot and was bleeding and that, eventually, Dean got into the car with Crowder and the two of them drove away.  7/29/13 Tr. 201-04.  According to James, he and Crews then fled on foot and were arrested by the police several minutes later.  7/29/13 Tr. 216.

The government also called as a witness Joseph Brennan, an emergency room nurse at Washington Hospital Center.  7/24/13 Tr. 223-24.  Brennan testified that he was working at the emergency room on the morning of September 21, 2011 when he received a call from a security guard that there was a vehicle sitting in the emergency room driveway with an injured individual inside.  7/24/13 Tr. 224.  Brennan also testified that he went outside, approached the vehicle, and observed an individual "covered in blood."  7/24/13 Tr. 225.  Finally, Brennan testified that he pulled the individual out of the car and as he did so, he observed that the individual's head was wounded, the "hair was matted," and "he was bleeding profusely."  7/24/13 Tr. 226.  This individual would later be identified as Dean.

### 2. Crews' Defense Relies Primarily On one Witness: Vakeema Ensley.

Crews' defense was that he was not involved in planning the robbery and did not participate in the attempted robbery.  7/18/13 Tr. 58.  Instead, Crews was in the

4

area at the time and he heard the gunshots from the CVS.  7/18/13 Tr. 60.  Out of

concern for his half-brother James, he headed towards the sound of the gunshots,

found James and Dean, and discovered that Dean had been shot.  7/18/13 Tr. 60.

Crews' defense relied primarily upon just one witness: Vakeema Ensley.[2]

Ensley testified that she and Crews were in a very close relationship in 2011 and

that he spent the majority of nights at her house in Silver Spring, Maryland.  8/2/13

Tr. 145.   Ensley testified that in September 2011 both she and Crews were

employed by the Greater United Urban League.  8/2/13 Tr. 147.  She then testified

that on the morning of the attempted robbery, she and Crews drove from her house

to Beltsville, Maryland where they purchased a part for her mother's car.  8/2/13

Tr. 148.  They then drove to Crews' grandmother's house at 808 Butternut Street

in Washington D.C., near the CVS, in order to meet Crews' half-brother James.

8/2/13 Tr. 153.  Ensley dropped Crews off near 808 Butternut Street, parked her

car in front of that house and went inside.  8/2/13 Tr. 154.  Ensley put her

belongings, including her car keys, on top of a radiator just inside the front door,

checked Crews' mail, and then went upstairs into a bedroom and lay down.  8/2/13

---

[2] Besides Ensley, Crews called Metropolitan Police Department Officer Oliver
Garvey to testify.  Officer Garvey's direct testimony, however, was limited to
impeaching the testimony of government witness Sheila Braggs.  Officer Garvey
testified that when he first interviewed Braggs, she stated that she saw three black
males on a street near the CVS immediately after the attempted robbery.  During
Braggs' direct testimony, however, she stated that she saw four black males.
8/2/13 Tr. 128-37.

Tr. 157.  Later, as Ensley was still laying on the bed, she heard "engines roaring and sirens" so she went outside to see what was happening.  8/2/13 Tr. 158.  She followed the sound of the police sirens and walked down the street to where she could observe multiple police officers; at that point, she saw that Crews and James were both in police custody.  8/2/13 Tr. 159.  Ensley turned around, went back to the house, and called James' girlfriend.  8/2/13 Tr. 160.

On cross examination, the government attempted to impeach Ensley by using her grand jury testimony and asking questions that suggested that her testimony before the grand jury was inconsistent with her direct-examination testimony.  8/2/13 Tr. 167-68.

### 3.  The Trial Results in a Hung Jury on All Counts.

The trial resulted in a hung jury.  8/14/13 Tr. 17-18.  After considering all of the evidence, the government's case, and Crews' defense, the jury was not able to reach a unanimous verdict on any of the charges against Crews or Crowder. 8/14/13 Tr. 18.  The district court declared a mistrial.  8/14/13 Tr. 18.

### B. The Second Trial

The government pursued a second trial against both Crews and Crowder for all seven counts in the indictment.  The trial was before the same judge and took place in February and March 2014.  The parties once again stipulated that Dean was shot during the attempted robbery but that he died of unrelated gunshot

wounds.  2/20/14 Tr. 113; 118-19.  The parties also again went to great lengths to ensure that no witness testified regarding the circumstances surrounding Dean's death.  2/20/14 Tr. 119-21.

### 1. The Government Puts on a Nearly Identical Case in Chief Except that Brennan's Testimony is More Graphic.

In the second trial, the government presented a nearly identical case, with the same fact witnesses, the same experts, and the same evidence.  The only substantive difference in the government's case was that Brennan, the emergency room nurse, added to his testimony regarding Dean's injuries.  2/20/14 Tr. 111.  In the first trial, Brennan testified that Dean was "covered in blood" and "bleeding profusely."  7/24/13 Tr. 225-26.  In the second trial, Brennan testified that Dean was "gravely wounded" and that as Brennan approached Dean, Brennan could see "brain matter that was exposed."  2/20/14 Tr. 111.

At the conclusion of Brennan's direct testimony, the attorneys and the judge had a discussion outside the presence of the jury regarding Brennan's new description of Dean's injuries.  2/20/14 Tr. 113.  Crowder's attorney explained that although everyone had "made an effort to stay away from what happened to Kirk Dean," Brennan had now testified that Dean had a grave injury and that Brennan could see "brain matter."  2/20/14 Tr. 113.  Crowder's attorney concluded, "I don't know if we can un-ring this bell."  2/20/14 Tr. 113.  The judge agreed that Brennan's testimony in the second trial was more graphic than in the first and that

in particular, the reference to seeing "brain matter" by Brennan "was totally unexpected." 2/20/14 Tr. 119. Both Crowder and Crews then moved for a mistrial, which was denied. 2/20/14 Tr. 122. Instead, at the conclusion of Brennan's testimony, the judge instructed the jury, "I'll just remind you that Mr. Kirk Dean later died from an unrelated gunshot wound." 2/20/14 Tr. 119. The judge further instructed the jury to "not allow sympathy or passion" to impact its decision and "to disregard the testimony you heard about brain matter and matted, bloody hair." 2/20/14 Tr. 124.

### 2. Crews Calls Only One Witness – Ensley – But the District Court Strikes Her Entire Testimony and Tells the Jury to Disregard It.

Crews' entire defense was once again the testimony of Ensley. Ensley's testimony during direct examination mirrored her testimony from the first trial. She testified that Crews was her fiancé and that in the months before the attempted robbery, he spent most nights at her house. 3/5/14 Tr. 58-59. She also testified that on the morning of the attempted robbery, she and Crews drove her car from her house to his house at 808 Butternut Street, he left, and she went inside the house and lay down on his bed. 3/5/14 Tr. 61; 69-72. Ensley testified that several minutes later, she heard car engines and police sirens so she went outside and walked down the street towards the sound of the sirens. 3/5/14 Tr. 73. Ensley then

testified that she observed Crews and James in police custody so she went back to the house and called James' girlfriend. 3/5/14 Tr. 74.

Ensley's direct testimony addressed two other topics. At one point during her explanation of what happened on the morning of the attempted robbery, Ensley testified that until Crews and Crowder were arrested and charged in this case, she did not know Crowder. 3/5/14 Tr. 69. Finally, Crews' attorney showed Ensley two photographs which she identified as photographs of the interior of her car. 3/5/14 Tr. 76-78. The second photograph showed an empty "Fruitopia" bottle and Ensley testified that neither she nor Crews drank that particular type of soda. 3/5/14 Tr. 77-78.

On cross-examination, the prosecutor began by repeating the question as to whether Ensley knew Crowder before the events of September 21, 2011. 3/5/14 Tr. 80. The prosecutor then asked whether Ensley had ever received a phone call from Crowder. 3/5/14 Tr. 81. Ensley answered "no" to all of these questions. 3/5/14 Tr. 81. The prosecutor then began to ask Ensley, "isn't it true that during a recording," but the judge interrupted the prosecutor and asked to see all attorneys for a bench conference. 3/5/14 Tr. 81-82

The prosecutor explained that Ensley "perjured herself" and that the government intended to play a recording of a phone call in which Ensley told Crews that she had received a phone call from Crowder. 3/5/14 Tr. 83. The

9

prosecutor also explained that the "purpose of us using the call is for impeachment purposes." 3/5/14 Tr. 92.

After a break, the court appointed an attorney to represent Ensley. After consultation with Ensley and the other counsel, Ensley's attorney informed the court that "there is a potential problem based upon [Ensley's] earlier testimony today with regard to her statement that she didn't talk to this person known as Twon, and yet there is a jail call transcript which arguably supports otherwise." 3/5/14 Tr. 107. Ensley's attorney continued: "[M]ore importantly, which I am more concerned about here is, in speaking with government counsel, it's my impression that this is not the only source of potential impeachment." 3/5/14 Tr. 107. Ensley's attorney then informed the court that "she wants to assert the Fifth Amendment at this point." 3/5/14 Tr. 108.

The court did not ask Ensley or her attorney whether her invocation of the Fifth Amendment was for all future questions or was only related to her testimony that she did not know Crowder. Similarly, the court did not ask Ensley or her attorney whether she would answer cross-examination questions regarding the other aspects of her direct testimony, such as her version of the events that occurred on the morning of the attempted robbery.

Instead, the court concluded that "all of her testimony goes." 3/5/14 Tr. 114. The court reasoned that "I don't think I can parse through," and the court invited

submission of a jury instruction regarding Ensley's testimony.  3/5/14 Tr. 115.

The next day, the court instructed the jury "to forget all the testimony you heard

from [Ensley], put it out of your mind, and there are legal reasons for this that

don't really concern you in your roles as jurors."  3/6/14 Tr. 14.

### 3. The Jury is Again Unable to Reach a Unanimous Verdict on Four of the Seven Counts, but Convicts Crews of Attempted Robbery.

After the jury had been deliberating over the course of several days, it sent a

note to the court stating that it had reviewed all of the evidence and after

"extensive discussion" it was "impossible to reach a unanimous verdict on all 7

counts."  App. 63.  The court responded by stating that "I urge you to continue

with your deliberations."  3/11/14 Tr. 17.  The next day, the jury sent another note,

stating that "we have reached a unanimous verdict on three counts.  We remain

firmly divided on the four remaining counts."  App. 64.  The three counts on which

the jury reached a unanimous verdict were: finding Crowder not guilty on Count 1

(conspiracy to commit robbery) and not guilty on Count 4 (possession of a firearm

in furtherance of a crime of violence), and finding Crews guilty on Count 2

(attempted robbery).  App. 43   The court later declared a mistrial on the four

remaining counts.  3/18/14 Tr. 3-4.  Six months later, the court sentenced Crews to

225 months in prison.  12/16/14 Tr. 29-30.

## SUMMARY OF ARGUMENT

First, the district court abused its discretion when it struck Ensley's entire testimony after she refused to answer questions regarding a recorded phone call that arguably contradicted her testimony during direct examination. In striking Ensley's entire testimony, the court applied the wrong legal standard. The correct standard, often referred to as the "*Cardillo* standard," states that it is inappropriate to utilize the drastic remedy of striking a witness' entire testimony where that witness invokes the privilege against self-incrimination with respect to collateral matters, such as the witness' own credibility. The court never considered whether Ensley's invocation of the privilege related solely to collateral matters; instead, the court improperly concluded that because she refused to answer some questions, all of her testimony had to be struck.

This error deprived Crews of his constitutional right to present a defense and his constitutional right to present witnesses because Ensley was his only witness, *i.e.*, his entire defense. Had the court applied the correct legal standard, it would not have struck Ensley's entire testimony. Plus, there were at least three less extreme alternatives available to the court that would have preserved Crews' constitutional rights while allowing the government to impeach Ensley. By failing to apply the correct legal standard and by failing to utilize one of these available alternatives, the court abused its discretion.

12

Second, the court abused its discretion by denying defendants' motion for a mistrial after Brennan testified that he observed Dean's "brain matter" as he approached Dean after the attempted robbery. Brennan's graphic testimony was highly prejudicial to Crews because it likely incited the passions and sympathies of the jury by implicitly stating that Crews and the other alleged co-conspirators left a mortally wounded Dean in order to save themselves. Moreover, Brennan's statements undermined defendants' version of events. The court's curative instructions did not and could not remedy the problem. As a result, the court should have declared a mistrial, and its failure to do so was error.

## ARGUMENT

### I. THE DISTRICT COURT ABUSED ITS DISCRETION BY STRIKING ENSLEY'S ENTIRE TESTIMONY.

The Sixth Amendment's Compulsory Process Clause and the Fourteenth Amendment's Due Process Clause both provide a criminal defendant the right to call witnesses and the right to put on a defense. *Rock v. Arkansas*, 483 U.S. 44, 49 (1987); *Crane v. Kentucky*, 476 U.S. 683, 690 (1986). As the Missouri Supreme Court has reasoned, a criminal defendant not only has the constitutional right to confront witnesses, but "courts must also be acutely aware of the equally important constitutional right of a defendant in a criminal case to call witnesses in his defense and to have the jury consider their testimony." *State v. Brown*, 549 S.W.2d 336, 343 (Mo. 1977).

13

Here, the district court violated Crews' constitutional right to call witnesses and put on a defense by striking the entire testimony of his only witness: Vakeema Ensley. This ruling was an abuse of discretion for three reasons.[3] First, the district court applied the wrong legal standard, ignoring the rule that when a witness refuses to answer questions that pertain to a collateral issue, it is not proper to strike the witness' entire testimony. Second, under the correct standard, Ensley's entire testimony should not have been stricken. Third, there were at least three alternative remedies available that would have preserved Crews' constitutional rights while still properly addressing Ensley's refusal to answer questions.

### A. The District Court Applied the Wrong Legal Standard When Striking Ensley's Entire Testimony.

#### 1. Under the *Cardillo* Standard, a Court May Not Strike a Witness' Entire Testimony When the Witness Refuses to Answer Questions that Address Collateral Issues.

It is a "well-established rule that a court may only apply the extreme sanction of striking a witness' entire testimony when the question asked pertains to matters directly affecting the witness' testimony; the judge may not use the

---

[3] A federal appellate court reviews a decision whether to strike witness testimony for an abuse of discretion. *See United States v. Wilkins*, 742 F.3d 354, 360 (8th Cir. 2014). *See also United States v. Wilson*, 605 F.3d 985, 1011 (D.C. Cir. 2010) (stating that the abuse of discretion standard applies to the review of a trial court's ruling to prohibit examination of a witness where the appellant claims that the ruling violated the Sixth Amendment's Confrontation Clause). "An abuse of discretion occurs when the court applies the wrong legal standard or relies on clearly erroneous facts." *Linder v. Dep't of Justice*, 133 F.3d 17, 24 (D.C. Cir. 1998) (citations omitted).

sanction when the privileged answer pertains to a collateral matter." *Schnelle v. State*, 103 S.W.3d 165, 174 (Mo. Ct. App. 2003) (quoting *United States v. Negrete Gonzales*, 966 F.2d 1277, 1280 (9th Cir. 1992).  As the United States Court of Appeals for the Eighth Circuit has stated, "[d]irect testimony may remain on the record, even though the witness asserts the privilege against self-incrimination on cross-examination, if the Fifth Amendment is invoked on cross-examination as to collateral matters rather than the details of the direct testimony." *United States v. Wilkins*, 742 F.3d 354, 360 (8th Cir. 2014).  *See also United States v. Esparsen*, 930 F.2d 1461, 1469 (10th Cir. 1991).

The seminal case addressing whether to strike a witness' entire testimony because the witness invokes his/her privilege against self-incrimination is *United States v. Cardillo*, 316 F.2d 606 (2d Cir. 1963).  As the United States Court of Appeals for the Eighth Circuit has stated, whether to strike the direct testimony of a witness who refuses to answer questions on cross examination "is governed by principles set forth in *United States v. Cardillo*."  *Carlos v. Wyrick*, 753 F.2d 691, 693 (8th Cir. 1985).  *See also Burke v. Harman*, 574 N.W.2d 156, 167 (Neb. Ct. App. 1998) (describing *Cardillo* as the "seminal case" on this issue).

In *Cardillo*, the court reasoned that witnesses who invoke the privilege against self-incrimination during cross-examination fall into three categories:  (1) witnesses who refuse to answer questions where "the answer would have been so

15

closely related to the commission of the crime that the entire testimony of the witness should be stricken;" (2) witnesses who refuse to answer questions "in which the subject matter of the testimony was connected solely with one phase of the case"; for these witnesses, "a partial striking might suffice;" and (3) witnesses who refuse to answer questions that "involve collateral matters or cumulative testimony concerning credibility";  for these witnesses, the refusal to answer questions "would not require a direction to strike and which could be handled (in a jury case) by the judge's charge [to the jury]." *Cardillo*, 316 F.2d at 613.

Testimony is considered collateral and falls into the third *Cardillo* category if it "do[es] not relate to the substance" of a witness' direct testimony. *Burke*, 574 N.W.2d at 173 (citations omitted).  As the *Burke* court reasoned, the "test" for whether testimony is collateral in nature is whether "the cross-examining party would be entitled to prove it as part of his case." *Id.* at 171 (citations omitted).

For example, in *United States v. Negrete-Gonzales*, a codefendant who pled guilty to attempting to sell cocaine, testified for the defendant that she alone attempted the sale.  On cross-examination, the witness refused to answer questions regarding the source of her cocaine.  966 F.2d 1277, 1279 (9th Cir. 1992).  The district court struck her entire testimony, and the defendant was convicted. *Id.* at 1280.  On appeal, the United States Court of Appeals for the Ninth Circuit reversed the conviction, reasoning that "the identity of unknown suppliers is only

16

peripherally related to the witness' direct testimony." *Id.* The court reasoned that because "she was the defendant's key witness, and no other witness could duplicate her testimony," it was reversible error for the district court to strike her entire testimony because she would not identify the source of the cocaine. *Id.*

### 2. The District Court Failed to Apply the *Cardillo* Standard and Failed to Consider Whether the Questions Ensley Refused to Answer Were Collateral in Nature.

Here, the district court never applied *Cardillo* and never considered whether the questions Ensley refused to answer were collateral in nature. Ensley's direct testimony addressed the following five topics:

- that Crews was her fiancé and spent most nights at her house;
- her version of the events on the morning of the attempted robbery, including identifying Crews in a video taken at the 7-Eleven in Maryland;
- that she did not loan her car to anyone and no one asked her to borrow her car or her car keys;
- that before September 21, 2011, she did not know Crowder; and
- identifying photographs of her car and photographs of its contents, including an empty soda bottle of a type of soda that neither she nor Crews drank.

3/5/14 Tr. 56-78.

The government's attempts to question Ensley regarding a phone conversation she had with Crews where she allegedly stated that Crowder called her, addressed only one of the five topics. Indeed, the government acknowledged that "the reason we're using the call is to impeach Ms. Ensley." 3/5/14 Tr. 91.

17

Despite the fact that Ensley's invocation of her privilege against self-incrimination related solely to a recorded phone call that the government was attempting to use in order to impeach her, the court ruled that Ensley's entire testimony needed to be stricken from the record. 3/5/14 Tr. 114. As a result, Ensley did not retake the witness stand; instead, the court instructed the jury "to forget all the testimony that you heard from [Ensley], put it out of your mind." 3/11/14 Tr. 14. The court further instructed the jury that it "must not consider Ms. Ensley's testimony." 3/11/14 Tr. 14.

The court never applied the *Cardillo* standard and never considered whether Ensley was refusing to answer questions that were collateral in nature. Instead, the court applied a legal rule that does not exist: if a witness refuses to answer questions on cross-examination, the witness' entire testimony must be stricken. But as nearly all federal and state courts that have considered the issue have made clear, this is not the standard.[4]

---

[4]  *See Wilkins*, 742 F.3d at 360 (8th Cir. 2014); *Negrete Gonzales*, 966 F.2d at 1280 (9th Cir. 1992); *Esparsen*, 930 F.2d at 1469 (10th Cir. 1991); *Cardillo*, 316 F.2d at 613 (2d Cir. 1963). *See also United States v. Zapata*, 871 F.2d 616, 624 (7th Cir. 1989); *United States v. Hirst*, 668 F.2d 1180, 1183 (11th Cir. 1982); *Turner v. Fair*, 617 F.2d 7, 10 (1st Cir. 1980); *United States v. Stephens*, 492 F.2d 1367, 1374–75 (6th Cir. 1974); *United States v. Newman*, 490 F.2d 139, 145 (3rd Cir. 1974); *Fountain v. United States*, 384 F.2d 624, 628 (5th Cir. 1967); *United States v. Smith*, 342 F.2d 525, 527 (4th Cir. 1965); *Jackson v. State*, 695 P.2d 227, 237 n.8 (Alaska Ct. App. 1985); *State v. Dunlap*, 608 P.2d 41, 42 (Ariz. 1980); *Robertson v. State*, 765 S.W.2d 936, 940-41 (Ark. 1989); *People v. Coca*, 564 P.2d 431, 434 (Colo. 1977); *Johnson v. United States*, 418 A.2d 136, 140

This Court has held that a district court abuses its discretion "when the court applies the wrong legal standard." *Linder*, 133 F.3d at 24. The district court below did precisely that. Rather than consider whether Ensley was refusing to answer questions that were collateral in nature, *i.e.* the *Cardillo* standard, the court applied the wrong legal standard and concluded that because Ensley was invoking her privilege against self-incrimination with respect to *some question*s that went to her credibility*, all* of her testimony must be stricken. This ruling was an abuse of discretion and requires that Crews' conviction be reversed.

### B. Had the District Court Applied the Correct Legal Standard, Ensley's Entire Testimony Would Not Have Been Stricken.

Ensley's invocation of her privilege against self-incrimination falls into the third *Cardillo* category because the questions she refused to answer went to her credibility, and thus, were collateral in nature. As the United States Court of Appeals for the Second Circuit has recognized, "[a] general attack on credibility is . . . a collateral matter." *United States v. Treacy*, 639 F.2d 32, 45 (2d Cir. 2011).

---

(D.C. 1980); *Smith v. State*, 168 S.E.2d 587, 591 (Ga. 1969); *In the Interest of J.D.S.*, 436 N.W.2d 342, 348 (Iowa 1989); *State v. Montanez*, 523 P.2d 410, 414-15 (Kan. 1974); *Thomas v. State*, 63 492 A.2d 939, 943 (Md. 1985); *Commonwealth v. Funches*, 397 N.E.2d 1097, 1102 (Mass. 1979); *People v. Fuzi*, 323 N.W.2d 354, 356 (Mich. 1982); *State v. Spencer*, 248 N.W.2d 915, 919 (Minn. 1976); *State v. Brown*, 549 S.W.2d 336, 342-43 (Mo. 1977); *State v. Rogers*, 453 P.2d 593, 595 (N.M. Ct. App. 1969); *People v. Chin*, 490 N.E.2d 505, 510-11 (N.Y. 1986); *State v. Ray*, 444 S.E.2d 918, 923 (N.C. 1994); *State v. Iron Thunder*, 272 N.W.2d 299, 303 (S.D. 1978); *State v. Pickens*, 615 P.2d 537, 539-40 (Wash. Ct. App. 1980).

Similarly, the Nebraska Court of Appeals reasoned that whether testimony is collateral in nature depends on whether "the cross-examining party would be entitled to prove it as part of his case." *Burke*, 574 N.W.2d at 171 (citations omitted). If it is part of the cross-examining party's case, the testimony is direct; whereas if it is not, it is collateral. *Id.* Here, the government would not be entitled to prove whether Ensley knew Crowder as part of its case. Indeed, the government admitted that it was only questioning Ensley about her knowledge of Crowder in order to impeach her credibility with the recorded phone call. 3/5/14 Tr. 91. Questions that address the testifying witness' own credibility are quintessential collateral questions. *See Cardillo*, 316 F.2d at 613 (describing the third category of situations as those involving "collateral matters or cumulative testimony concerning credibility"). *See also United States v. Humphrey*, 696 F.2d 72, 75 (8th Cir. 1982) ("[i]f . . . the refusal [to answer] relates to collateral matters, *such as credibility*, the danger of prejudice to defendant is considerably less, and the witness' testimony may not need to be stricken.") (emphasis added).

Under the *Cardillo* standard, the proper remedy that the district court should have provided when Ensley refused to answer questions that addressed her credibility was to instruct the jury regarding inferences they may make from her refusal to answer. *Cardillo*, 316 F.2d at 613; *Negrete-Gonzales*, 966 F.2d at 1279. This remedy would have allowed the government to have the benefit of its attempt

to impeach Ensley's credibility, while preserving Crews' constitutional right to call witnesses and present a defense.  Instead, the court struck the entire testimony of Crews' only witness, and consequently, his entire defense.

### C. There Were at Least Three Alternative Remedies Available to the District Court that Would Not Have Violated Crews' Constitutional Rights.

Striking a witness' entire testimony is a "drastic remedy" that "is not to be lightly done."  *Lawson v. Murray*, 837 F.2d 653, 656 (4th Cir. 1988).  If there are less extreme alternatives available that would preserve the government's right to cross-examination while also preserving a defendant's constitutional rights to present witnesses and put on a defense, striking a witness' entire testimony is particularly inappropriate.  *Cardillo*, 316 F.2d at 613.  Here, the district court had at least three alternative remedies available that would have properly addressed Ensley's refusal to answer questions.

First, as mentioned above, the court could have: (a) allowed Ensley to invoke the privilege against self-incrimination in response to questions about the recorded phone call, and then, (b) given an instruction to the jury regarding the inferences it may draw based on Ensley's refusal to answer.  In fact, the government referenced the standard jury instruction ("Redbook instruction 2.212") for a witness who invokes the privilege against self-incrimination when discussing Ensley's invocation of the privilege with the court.  3/5/14 Tr. 111.  This remedy is

21

precisely the one that *Cardillo* recommends for witnesses like Ensley. *Cardillo*, 316 F.2d at 613.

Second, the district court could have struck the portion of Ensley's testimony where she stated that she did not know Crowder prior to the events of September 21, 2011. *See* 3/5/14 Tr. 69. The court stated, without explanation, that "all of her testimony goes. I don't think I can parse through." 3/5/14 Tr. 114. But this conclusion is not supported by the record. During Ensley's direct examination, Crews' attorney asked her four consecutive questions regarding Crowder and Ensley gave a simple, one-word answer to each question. "Did you know an Antwon Crowder back then?" Ensley answered "no." App. 3/5/14 Tr. 69. "Have you heard of Antwon Crowder since then?" Ensley answered "yes." 3/5/14 Tr. 69. "[U]p until his arrest on September 21, 2011, have you ever seen Mr. Crews with the person you now know is Antwon Crowder?" Ensley answered "no." 3/5/14 Tr. 69. "Have you ever heard him talk about Antwon Crowder or somebody named Twon?" Ensley answered "no." 3/5/14 Tr. 69. This entire series of questions and answers consumes less than half a page of the transcript and is the only time during Ensley's direct testimony in which she testified about whether she knew or spoke with Crowder. Contrary to the court's conclusion that

it could not "parse through," it could have struck this small portion of Ensley's direct testimony and left the overwhelming majority of her testimony in evidence.[5]

Third, the district court could have admitted Ensley's testimony from the first trial.  Unlike many other cases where a witness refuses to answer questions on cross examination, here, Ensley already provided direct testimony and was fully cross examined by the government.  Ensley's direct testimony in the first trial is nearly identical to her direct testimony in the second trial and addresses the same topics.  *Compare* 8/2/13 Tr. 149-61 *with* 3/5/14 Tr. 58-77.[6]  The government conducted a complete cross-examination of Ensley during the first trial.  8/2/13 Tr. 167-205.  The court, therefore, had the option of having the transcript of Ensley's testimony from the first trial read to the jury.  This procedure would have allowed

---

[5] The government may respond that striking only this portion of Ensley's direct testimony would have deprived it of the right to impeach Ensley.  Ensley's court-appointed attorney, however, proffered to the court that "in speaking with Government counsel, it's my impression that this is not the only source of potential impeachment."  3/5/14 Tr. 107.  The government, therefore, had other means to impeach Ensley and the particular topic of Ensley stating she did not know Crowder was unnecessary.  In fact, during the first trial, the government impeached Ensley by using her grand jury testimony, rather than by playing a recorded phone call.  8/2/13 Tr. 166-175.

[6] There are only two variances between Ensley's direct testimony in the first trial and her testimony in the second trial.  In the initial trial, Ensley offered an explanation for why she and Crews were driving to 808 Butternut Street.  8/2/13 Tr. 149.  In the second trial she failed to give this explanation.  In the second trial, Crews' attorney showed Ensley two photographs of the interior of her car.  Ensley was not shown these photographs in the first trial.  3/5/14 Tr. 76-78.  Neither of these differences is material.

the government to have the benefit of its cross-examination of Ensley that occurred in the first trial, while still preserving Crews' constitutional rights.

The district court could have employed any of these remedies. Instead, the court proceeded from the wrong legal standard and then utilized the "drastic remedy" of striking Ensley's entire testimony, depriving Crews of his constitutional right to present a defense and his constitutional right to call witnesses. In doing so, the court abused its discretion and Crews' conviction must be reversed.

## II. THE DISTRICT COURT ABUSED ITS DISCRETION BY DENYING DEFENDANTS' MOTION FOR A MISTRIAL AFTER BRENNAN'S GRAPHIC TESTIMONY REGARDING DEAN'S "BRAIN MATTER."

### A. Legal Standard

This Court has held that a district court abuses its discretion when it denies a defendant's motion for a mistrial based on inadmissible testimony where the testimony is "highly prejudicial" such that a jury cannot reasonably be expected to ignore it. *United States v. Eccleston*, 961 F.2d 955, 962 (D.C. Cir. 1992). In weighing the degree of prejudice of such testimony, this Court compares the probative force of the testimony at issue with the strength of the other admissible evidence that supports the verdict. *Id.* at 959. *See also United States v. Gomez-Pabon*, 911 F.2d 847, 858 (1st Cir. 1990); *United States v. Tarantino*, 846 F.2d 1384, 1413 (D.C. Cir. 1988).

In *Eccleston*, the defendant was charged with narcotics and firearm offenses after police officers found cocaine and ammunition in a bedroom in his mother's house. 961 F.2d at 956-57. There was conflicting evidence regarding whether the defendant actually lived in the house at the time the police officers conducted the search. *Id.* The government's evidence included the mother's statement to the police officers on the night of the search where she referred to the room in question as her "son's room." *Id.* at 957. The defendant's father testified that he believed the defendant was living in the house in question at the time of the police search. *Id.* at 958. The government also introduced various pieces of physical evidence connecting the defendant with the bedroom. *Id.* at 957-58. The defense called various family members as witnesses who testified that the defendant had moved out several months earlier, and since that time, his mother had been renting the room out to boarders who had a key and had access to the room. *Id.* at 958.

The testimony at issue in *Eccleston* was that of a police officer who was outside the house on the night of the search. *Id.* Called as a government witness, the officer testified that he saw three individuals walking towards the house and when he asked them why they were going there, one of them answered that they were "on their way to purchase crack cocaine from [the defendant]." *Id.* The defendant immediately objected to this testimony and moved for a mistrial. *Id.* The court sustained the objection and agreed that the testimony was inadmissible

25

hearsay, but denied the motion for a mistrial and instead offered to instruct the jury to disregard the officer's last answer. *Id.*

On appeal, this Court reversed the defendant's conviction and held that the district court abused its discretion in denying the motion for a mistrial. 961 F.2d at 961-62. The Court reasoned that the circumstantial evidence tying the defendant to the bedroom was conflicting and relatively weak. *Id.* at 961. In that context, the officer's testimony that directly linked the defendant to selling drugs "was devastating, moreover, in light of the slight and circumstantial quality of the government's legitimate case." *Id.* (internal quotation marks and citations omitted). The Court concluded that, after hearing this testimony, "the jury could not reasonably be expected to ignore [it]," and so as a result, the district court should have declared a mistrial. *Id.* at 962.

### B. Brennan's Graphic Testimony Regarding Dean's "Brain Matter" Was Highly Prejudicial When Compared with the Limited Evidence Linking Crews to the Attempted Robbery.

Brennan's testimony is analogous to the officer's testimony in *Eccleston* that required a mistrial. Here, the government had little evidence, besides James' testimony, tying Crews to the attempted robbery. Thus, the jury's determination of Crews' guilt came down essentially to whether the jury believed James' version of events and/or whether they could reasonably conclude that plausible alternative explanations existed. In *Eccleston*, the government's case was bolstered by

circumstantial evidence that linked the defendant to the scene of the crime. 961 F.2d at 957-58. Similarly, here, the government offered circumstantial evidence supporting its case, such as the fact that Crews was apprehended by police near the CVS. 2/18/14 Tr. 190-91.

Like the testimony at issue in *Eccleston* that tended to show the defendant's guilt, Brennan's testimony likely incited the passions and sympathies of the jury. If the jury believed Brennan and did not disregard his testimony regarding observing Dean's "brain matter," the implication is that Dean's co-conspirators, including Crews, left Dean to die. Brennan, an experienced emergency room nurse, testified that Dean was "gravely injured" and that Brennan could see exposed brain matter. In other words, Crews and the other co-conspirators fled, leaving Dean to die of his wounds.

Brennan's testimony was prejudicial to Crews in a second way. Crews' defense was that he was in the general area, heard the gunshots, and headed in the direction they came from out of concern for his half-brother. 7/18/13 Tr. 60. As he approached the CVS, he encountered James and Dean. 7/18/13 Tr. 60. Yet this defense is less credible if Dean was "gravely injured" and had exposed brain matter, as Brennan testified. As Crowder's attorney reasoned when he moved for a mistrial after Brennan's testimony, such a description of injuries contradicts the idea that Dean walked away from the CVS. 2/20/14 Tr. 122. Thus, not only was

27

Brennan's testimony graphic and likely to incite the passion and sympathy of the jury, it also undermined Crews' version of events.  As such, it was highly prejudicial and warranted a mistrial.

### C. The District Court's Jury Instruction Did Not Ameliorate the Prejudice.

The district court's instruction to the jury, 2/20/14 Tr. 119, did not eliminate the significant prejudice caused by Brennan's testimony.  The Supreme Court has long recognized the limitations of a curative jury instruction:

> [T]here are some contexts in which the risk that the jury will not, or cannot, follow instructions is so great, and the consequences of failure so vital to the defendant, that the practical and human limitations of the jury system cannot be ignored.

*Bruton v. United States*, 391 U.S. 123, 135 (1968).  Similarly, this Court has found it to be "particularly unrealistic" in some situations "to expect effective execution of the 'mental gymnastic' required by limiting instructions. . . ."  *United States v. Daniels*, 770 F.2d 1111, 1118 (D.C. Cir. 1985) (quoting *Nash v. United States*, 54 F.2d 1006, 1007 (2d Cir. 1932)).  In those situations, "'the naive assumption that prejudicial effects can be overcome by instructions to jury' become more clearly than ever 'unmitigated fiction.'"  *Id.* (quoting *Krulewitch v. United States*, 336 U.S. 440, 453 (1949) (Jackson, J. concurring)).

Here, a reasonable juror, after listening to nearly six full days of testimony regarding the attempted robbery and being previously told that Dean's death was

"unrelated" to the attempted robbery, could not help but be influenced by Brennan's testimony. It would require a significant feat of "mental gymnastics" by a jury to not be influenced by this piece of information as it evaluated what happened on the morning of September 21, 2011 and made credibility determinations regarding the competing versions of events. Just as in *Eccleston*, where this Court determined that a reasonable jury could not be expected to ignore the police officer's testimony, a reasonable jury in this case could not be expected to disregard Brennan's testimony regarding Dean's "brain matter."

Moreover, the district court's instruction was neither immediate nor emphatic. The district court instructed the jury, "I'll just remind you that Mr. Kirk Dean later died from an unrelated gunshot wound." 2/20/14 Tr. 119. Later in the day, the district court further instructed the jury to "not allow sympathy or passion" to impact its decision and "to disregard the testimony you heard about brain matter and matted, bloody hair." 2/20/14 Tr. 124. These instructions, occurring after Brennan's direct testimony regarding observing "brain matter," and couched as "reminders" to the jury were nowhere near enough to counteract the prejudice of Brennan's testimony to Crew's defense.

## CONCLUSION

The district court abused its discretion by striking all of Ensley's testimony even though she refused to answer questions that only related to her credibility.

Rather than utilize any of the alternative remedies available to it, the court utilized the "drastic" remedy of striking Ensley's testimony, even though Ensley was Crew's only witness and represented his entire defense.  By doing so, the court violated Crew's constitutional right to call witnesses and his constitutional right to present a defense.  Crew's conviction must be reversed for this reason alone.

Similarly, the district court abused its discretion by denying defendants' motion for a mistrial after Brennan testified that he saw Dean's "brain matter" as Dean lay bleeding outside of Washington Hospital Center.  This graphic testimony could not be ignored by any reasonable jury, despite the instruction to do so.  Because this testimony was highly prejudicial to Crews' defense, it was an abuse of discretion not to declare a mistrial. Crews' conviction must be reversed for this reason as well.

Respectfully submitted,

 /s/ Jerald R. Hess
Jerald R. Hess
Charles B. Wayne
DLA PIPER LLP (US)
500 8th Street, N.W.
Washington, D.C. 20004
(202) 799-4253
(202) 799-5253 (fax)
charles.wayne@dlapiper.com
j.hess@dlapiper.com

*Counsel for Appellant*
*(Appointed by this Court)*

30

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief, submitted under Fed. R. App. P. 32(a)(7)(B), complies with the type-volume limitation and contains 7,471 words.

  /s/ Jerald R. Hess

## CERTIFICATE OF SERVICE

I hereby certify that on this 4th day of October, 2016, I will electronically file the Brief for Appellant and the Appendix for Appellant with the Clerk of Court using the CM/ECF system, which will then send notification of such filing (NEF) to opposing counsel.  I also certify that I will cause two copies of the Brief for Appellant and one copy of the Appendix for Appellant to be served by hand on Elizabeth Trosman, Office of the United States Attorney, 555 4th Street, N.W., Washington, D.C. 20001.

  /s/ Jerald R. Hess

# ADDENDUM

## United States Code

18 U.S.C. § 922(g) ................................................................ A-2

18 U.S.C. § 924(c) ............................................................... A-24

18 U.S.C. § 1951 ................................................................. A-33

KeyCite Red Flag - Severe Negative Treatment

Unconstitutional or PreemptedUnconstitutional as Applied by Binderup v. Attorney General United States of America, 3rd Cir.(Pa.), Sep. 07, 2016

KeyCite Yellow Flag - Negative TreatmentProposed Legislation

United States Code Annotated
    Title 18. Crimes and Criminal Procedure (Refs & Annos)
        Part I. Crimes (Refs & Annos)
            Chapter 44. Firearms (Refs & Annos)

18 U.S.C.A. § 922

§ 922. Unlawful acts

Currentness

**(a)** It shall be unlawful--

**(1)** for any person--

**(A)** except a licensed importer, licensed manufacturer, or licensed dealer, to engage in the business of importing, manufacturing, or dealing in firearms, or in the course of such business to ship, transport, or receive any firearm in interstate or foreign commerce; or

**(B)** except a licensed importer or licensed manufacturer, to engage in the business of importing or manufacturing ammunition, or in the course of such business, to ship, transport, or receive any ammunition in interstate or foreign commerce;

**(2)** for any importer, manufacturer, dealer, or collector licensed under the provisions of this chapter to ship or transport in interstate or foreign commerce any firearm to any person other than a licensed importer, licensed manufacturer, licensed dealer, or licensed collector, except that--

**(A)** this paragraph and subsection (b)(3) shall not be held to preclude a licensed importer, licensed manufacturer, licensed dealer, or licensed collector from returning a firearm or replacement firearm of the same kind and type to a person from whom it was received; and this paragraph shall not be held to preclude an individual from mailing a firearm owned in compliance with Federal, State, and local law to a licensed importer, licensed manufacturer, licensed dealer, or licensed collector;

**(B)** this paragraph shall not be held to preclude a licensed importer, licensed manufacturer, or licensed dealer from depositing a firearm for conveyance in the mails to any officer, employee, agent, or watchman who, pursuant to the provisions of section 1715 of this title, is eligible to receive through the mails pistols, revolvers, and other firearms capable of being concealed on the person, for use in connection with his official duty; and

A-2

USCA Case #14-3089    Document #1638936    Filed: 10/03/2016    Page 42 of 72

(C) nothing in this paragraph shall be construed as applying in any manner in the District of Columbia, the Commonwealth of Puerto Rico, or any possession of the United States differently than it would apply if the District of Columbia, the Commonwealth of Puerto Rico, or the possession were in fact a State of the United States;

(3) for any person, other than a licensed importer, licensed manufacturer, licensed dealer, or licensed collector to transport into or receive in the State where he resides (or if the person is a corporation or other business entity, the State where it maintains a place of business) any firearm purchased or otherwise obtained by such person outside that State, except that this paragraph (A) shall not preclude any person who lawfully acquires a firearm by bequest or intestate succession in a State other than his State of residence from transporting the firearm into or receiving it in that State, if it is lawful for such person to purchase or possess such firearm in that State, (B) shall not apply to the transportation or receipt of a firearm obtained in conformity with subsection (b)(3) of this section, and (C) shall not apply to the transportation of any firearm acquired in any State prior to the effective date of this chapter;

(4) for any person, other than a licensed importer, licensed manufacturer, licensed dealer, or licensed collector, to transport in interstate or foreign commerce any destructive device, machinegun (as defined in section 5845 of the Internal Revenue Code of 1986), short-barreled shotgun, or short-barreled rifle, except as specifically authorized by the Attorney General consistent with public safety and necessity;

(5) for any person (other than a licensed importer, licensed manufacturer, licensed dealer, or licensed collector) to transfer, sell, trade, give, transport, or deliver any firearm to any person (other than a licensed importer, licensed manufacturer, licensed dealer, or licensed collector) who the transferor knows or has reasonable cause to believe does not reside in (or if the person is a corporation or other business entity, does not maintain a place of business in) the State in which the transferor resides; except that this paragraph shall not apply to (A) the transfer, transportation, or delivery of a firearm made to carry out a bequest of a firearm to, or an acquisition by intestate succession of a firearm by, a person who is permitted to acquire or possess a firearm under the laws of the State of his residence, and (B) the loan or rental of a firearm to any person for temporary use for lawful sporting purposes;

(6) for any person in connection with the acquisition or attempted acquisition of any firearm or ammunition from a licensed importer, licensed manufacturer, licensed dealer, or licensed collector, knowingly to make any false or fictitious oral or written statement or to furnish or exhibit any false, fictitious, or misrepresented identification, intended or likely to deceive such importer, manufacturer, dealer, or collector with respect to any fact material to the lawfulness of the sale or other disposition of such firearm or ammunition under the provisions of this chapter;

(7) for any person to manufacture or import armor piercing ammunition, unless--

(A) the manufacture of such ammunition is for the use of the United States, any department or agency of the United States, any State, or any department, agency, or political subdivision of a State;

(B) the manufacture of such ammunition is for the purpose of exportation; or

(C) the manufacture or importation of such ammunition is for the purpose of testing or experimentation and has been authorized by the Attorney General;

**A-3**

**(8)** for any manufacturer or importer to sell or deliver armor piercing ammunition, unless such sale or delivery--

**(A)** is for the use of the United States, any department or agency of the United States, any State, or any department, agency, or political subdivision of a State;

**(B)** is for the purpose of exportation; or

**(C)** is for the purpose of testing or experimentation and has been authorized by the Attorney General; [1]

**(9)** for any person, other than a licensed importer, licensed manufacturer, licensed dealer, or licensed collector, who does not reside in any State to receive any firearms unless such receipt is for lawful sporting purposes.

**(b)** It shall be unlawful for any licensed importer, licensed manufacturer, licensed dealer, or licensed collector to sell or deliver--

**(1)** any firearm or ammunition to any individual who the licensee knows or has reasonable cause to believe is less than eighteen years of age, and, if the firearm, or ammunition is other than a shotgun or rifle, or ammunition for a shotgun or rifle, to any individual who the licensee knows or has reasonable cause to believe is less than twenty-one years of age;

**(2)** any firearm to any person in any State where the purchase or possession by such person of such firearm would be in violation of any State law or any published ordinance applicable at the place of sale, delivery or other disposition, unless the licensee knows or has reasonable cause to believe that the purchase or possession would not be in violation of such State law or such published ordinance;

**(3)** any firearm to any person who the licensee knows or has reasonable cause to believe does not reside in (or if the person is a corporation or other business entity, does not maintain a place of business in) the State in which the licensee's place of business is located, except that this paragraph (A) shall not apply to the sale or delivery of any rifle or shotgun to a resident of a State other than a State in which the licensee's place of business is located if the transferee meets in person with the transferor to accomplish the transfer, and the sale, delivery, and receipt fully comply with the legal conditions of sale in both such States (and any licensed manufacturer, importer or dealer shall be presumed, for purposes of this subparagraph, in the absence of evidence to the contrary, to have had actual knowledge of the State laws and published ordinances of both States), and (B) shall not apply to the loan or rental of a firearm to any person for temporary use for lawful sporting purposes;

**(4)** to any person any destructive device, machinegun (as defined in section 5845 of the Internal Revenue Code of 1986), short-barreled shotgun, or short-barreled rifle, except as specifically authorized by the Attorney General consistent with public safety and necessity; and

**(5)** any firearm or armor-piercing ammunition to any person unless the licensee notes in his records, required to be kept pursuant to section 923 of this chapter, the name, age, and place of residence of such person if the person is an

individual, or the identity and principal and local places of business of such person if the person is a corporation or other business entity.

Paragraphs (1), (2), (3), and (4) of this subsection shall not apply to transactions between licensed importers, licensed manufacturers, licensed dealers, and licensed collectors. Paragraph (4) of this subsection shall not apply to a sale or delivery to any research organization designated by the Attorney General.

**(c)** In any case not otherwise prohibited by this chapter, a licensed importer, licensed manufacturer, or licensed dealer may sell a firearm to a person who does not appear in person at the licensee's business premises (other than another licensed importer, manufacturer, or dealer) only if--

> **(1)** the transferee submits to the transferor a sworn statement in the following form:

"Subject to penalties provided by law, I swear that, in the case of any firearm other than a shotgun or a rifle, I am twenty-one years or more of age, or that, in the case of a shotgun or a rifle, I am eighteen years or more of age; that I am not prohibited by the provisions of chapter 44 of title 18, United States Code, from receiving a firearm in interstate or foreign commerce; and that my receipt of this firearm will not be in violation of any statute of the State and published ordinance applicable to the locality in which I reside. Further, the true title, name, and address of the principal law enforcement officer of the locality to which the firearm will be delivered are ...................................................................................

Signature ........ Date ........"

> and containing blank spaces for the attachment of a true copy of any permit or other information required pursuant to such statute or published ordinance;

> **(2)** the transferor has, prior to the shipment or delivery of the firearm, forwarded by registered or certified mail (return receipt requested) a copy of the sworn statement, together with a description of the firearm, in a form prescribed by the Attorney General, to the chief law enforcement officer of the transferee's place of residence, and has received a return receipt evidencing delivery of the statement or has had the statement returned due to the refusal of the named addressee to accept such letter in accordance with United States Post Office Department regulations; and

> **(3)** the transferor has delayed shipment or delivery for a period of at least seven days following receipt of the notification of the acceptance or refusal of delivery of the statement.

A copy of the sworn statement and a copy of the notification to the local law enforcement officer, together with evidence of receipt or rejection of that notification shall be retained by the licensee as a part of the records required to be kept under section 923(g).

**(d)** It shall be unlawful for any person to sell or otherwise dispose of any firearm or ammunition to any person knowing or having reasonable cause to believe that such person--

> **(1)** is under indictment for, or has been convicted in any court of, a crime punishable by imprisonment for a term exceeding one year;

A-5

**(2)** is a fugitive from justice;

**(3)** is an unlawful user of or addicted to any controlled substance (as defined in section 102 of the Controlled Substances Act (21 U.S.C. 802));

**(4)** has been adjudicated as a mental defective or has been committed to any mental institution;

**(5)** who, being an alien--

  **(A)** is illegally or unlawfully in the United States; or

  **(B)** except as provided in subsection (y)(2), has been admitted to the United States under a nonimmigrant visa (as that term is defined in section 101(a)(26) of the Immigration and Nationality Act (8 U.S.C. 1101(a)(26)));

**(6)** who [2] has been discharged from the Armed Forces under dishonorable conditions;

**(7)** who, having been a citizen of the United States, has renounced his citizenship;

**(8)** is subject to a court order that restrains such person from harassing, stalking, or threatening an intimate partner of such person or child of such intimate partner or person, or engaging in other conduct that would place an intimate partner in reasonable fear of bodily injury to the partner or child, except that this paragraph shall only apply to a court order that--

  **(A)** was issued after a hearing of which such person received actual notice, and at which such person had the opportunity to participate; and

  **(B)(i)** includes a finding that such person represents a credible threat to the physical safety of such intimate partner or child; or

  **(ii)** by its terms explicitly prohibits the use, attempted use, or threatened use of physical force against such intimate partner or child that would reasonably be expected to cause bodily injury; or

**(9)** has been convicted in any court of a misdemeanor crime of domestic violence.

This subsection shall not apply with respect to the sale or disposition of a firearm or ammunition to a licensed importer, licensed manufacturer, licensed dealer, or licensed collector who pursuant to subsection (b) of section 925 of this chapter is not precluded from dealing in firearms or ammunition, or to a person who has been granted relief from disabilities pursuant to subsection (c) of section 925 of this chapter.

**A-6**

USCA Case #14-3089    Document #1638936    Filed: 10/03/2016    Page 46 of 72

**(e)** It shall be unlawful for any person knowingly to deliver or cause to be delivered to any common or contract carrier for transportation or shipment in interstate or foreign commerce, to persons other than licensed importers, licensed manufacturers, licensed dealers, or licensed collectors, any package or other container in which there is any firearm or ammunition without written notice to the carrier that such firearm or ammunition is being transported or shipped; except that any passenger who owns or legally possesses a firearm or ammunition being transported aboard any common or contract carrier for movement with the passenger in interstate or foreign commerce may deliver said firearm or ammunition into the custody of the pilot, captain, conductor or operator of such common or contract carrier for the duration of the trip without violating any of the provisions of this chapter. No common or contract carrier shall require or cause any label, tag, or other written notice to be placed on the outside of any package, luggage, or other container that such package, luggage, or other container contains a firearm.

**(f)(1)** It shall be unlawful for any common or contract carrier to transport or deliver in interstate or foreign commerce any firearm or ammunition with knowledge or reasonable cause to believe that the shipment, transportation, or receipt thereof would be in violation of the provisions of this chapter.

**(2)** It shall be unlawful for any common or contract carrier to deliver in interstate or foreign commerce any firearm without obtaining written acknowledgement of receipt from the recipient of the package or other container in which there is a firearm.

**(g)** It shall be unlawful for any person--

  **(1)** who has been convicted in any court of, a crime punishable by imprisonment for a term exceeding one year;

  **(2)** who is a fugitive from justice;

  **(3)** who is an unlawful user of or addicted to any controlled substance (as defined in section 102 of the Controlled Substances Act (21 U.S.C. 802));

  **(4)** who has been adjudicated as a mental defective or who has been committed to a mental institution;

  **(5)** who, being an alien--

    **(A)** is illegally or unlawfully in the United States; or

    **(B)** except as provided in subsection (y)(2), has been admitted to the United States under a nonimmigrant visa (as that term is defined in section 101(a)(26) of the Immigration and Nationality Act (8 U.S.C. 1101(a)(26)));

  **(6)** who has been discharged from the Armed Forces under dishonorable conditions;

  **(7)** who, having been a citizen of the United States, has renounced his citizenship;

A-7

**(8)** who is subject to a court order that--

**(A)** was issued after a hearing of which such person received actual notice, and at which such person had an opportunity to participate;

**(B)** restrains such person from harassing, stalking, or threatening an intimate partner of such person or child of such intimate partner or person, or engaging in other conduct that would place an intimate partner in reasonable fear of bodily injury to the partner or child; and

**(C)(i)** includes a finding that such person represents a credible threat to the physical safety of such intimate partner or child; or

**(ii)** by its terms explicitly prohibits the use, attempted use, or threatened use of physical force against such intimate partner or child that would reasonably be expected to cause bodily injury; or

**(9)** who has been convicted in any court of a misdemeanor crime of domestic violence,

to ship or transport in interstate or foreign commerce, or possess in or affecting commerce, any firearm or ammunition; or to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce.

**(h)** It shall be unlawful for any individual, who to that individual's knowledge and while being employed for any person described in any paragraph of subsection (g) of this section, in the course of such employment--

**(1)** to receive, possess, or transport any firearm or ammunition in or affecting interstate or foreign commerce; or

**(2)** to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce.

**(i)** It shall be unlawful for any person to transport or ship in interstate or foreign commerce, any stolen firearm or stolen ammunition, knowing or having reasonable cause to believe that the firearm or ammunition was stolen.

**(j)** It shall be unlawful for any person to receive, possess, conceal, store, barter, sell, or dispose of any stolen firearm or stolen ammunition, or pledge or accept as security for a loan any stolen firearm or stolen ammunition, which is moving as, which is a part of, which constitutes, or which has been shipped or transported in, interstate or foreign commerce, either before or after it was stolen, knowing or having reasonable cause to believe that the firearm or ammunition was stolen.

**(k)** It shall be unlawful for any person knowingly to transport, ship, or receive, in interstate or foreign commerce, any firearm which has had the importer's or manufacturer's serial number removed, obliterated, or altered or to possess or receive any firearm which has had the importer's or manufacturer's serial number removed, obliterated, or altered and has, at any time, been shipped or transported in interstate or foreign commerce.

A-8

**(l)** Except as provided in section 925(d) of this chapter, it shall be unlawful for any person knowingly to import or bring into the United States or any possession thereof any firearm or ammunition; and it shall be unlawful for any person knowingly to receive any firearm or ammunition which has been imported or brought into the United States or any possession thereof in violation of the provisions of this chapter.

**(m)** It shall be unlawful for any licensed importer, licensed manufacturer, licensed dealer, or licensed collector knowingly to make any false entry in, to fail to make appropriate entry in, or to fail to properly maintain, any record which he is required to keep pursuant to section 923 of this chapter or regulations promulgated thereunder.

**(n)** It shall be unlawful for any person who is under indictment for a crime punishable by imprisonment for a term exceeding one year to ship or transport in interstate or foreign commerce any firearm or ammunition or receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce.

**(o)(1)** Except as provided in paragraph (2), it shall be unlawful for any person to transfer or possess a machinegun.

**(2)** This subsection does not apply with respect to--

    **(A)** a transfer to or by, or possession by or under the authority of, the United States or any department or agency thereof or a State, or a department, agency, or political subdivision thereof; or

    **(B)** any lawful transfer or lawful possession of a machinegun that was lawfully possessed before the date this subsection takes effect.

**(p)(1)** It shall be unlawful for any person to manufacture, import, sell, ship, deliver, possess, transfer, or receive any firearm--

    **(A)** that, after removal of grips, stocks, and magazines, is not as detectable as the Security Exemplar, by walk-through metal detectors calibrated and operated to detect the Security Exemplar; or

    **(B)** any major component of which, when subjected to inspection by the types of x-ray machines commonly used at airports, does not generate an image that accurately depicts the shape of the component. Barium sulfate or other compounds may be used in the fabrication of the component.

**(2)** For purposes of this subsection--

    **(A)** the term "firearm" does not include the frame or receiver of any such weapon;

    **(B)** the term "major component" means, with respect to a firearm, the barrel, the slide or cylinder, or the frame or receiver of the firearm; and

**(C)** the term "Security Exemplar" means an object, to be fabricated at the direction of the Attorney General, that is--

**(i)** constructed of, during the 12-month period beginning on the date of the enactment of this subsection, 3.7 ounces of material type 17-4 PH stainless steel in a shape resembling a handgun; and

**(ii)** suitable for testing and calibrating metal detectors:

*Provided, however,* That at the close of such 12-month period, and at appropriate times thereafter the Attorney General shall promulgate regulations to permit the manufacture, importation, sale, shipment, delivery, possession, transfer, or receipt of firearms previously prohibited under this subparagraph that are as detectable as a "Security Exemplar" which contains 3.7 ounces of material type 17-4 PH stainless steel, in a shape resembling a handgun, or such lesser amount as is detectable in view of advances in state-of-the-art developments in weapons detection technology.

**(3)** Under such rules and regulations as the Attorney General shall prescribe, this subsection shall not apply to the manufacture, possession, transfer, receipt, shipment, or delivery of a firearm by a licensed manufacturer or any person acting pursuant to a contract with a licensed manufacturer, for the purpose of examining and testing such firearm to determine whether paragraph (1) applies to such firearm. The Attorney General shall ensure that rules and regulations adopted pursuant to this paragraph do not impair the manufacture of prototype firearms or the development of new technology.

**(4)** The Attorney General shall permit the conditional importation of a firearm by a licensed importer or licensed manufacturer, for examination and testing to determine whether or not the unconditional importation of such firearm would violate this subsection.

**(5)** This subsection shall not apply to any firearm which--

**(A)** has been certified by the Secretary of Defense or the Director of Central Intelligence, after consultation with the Attorney General and the Administrator of the Federal Aviation Administration, as necessary for military or intelligence applications; and

**(B)** is manufactured for and sold exclusively to military or intelligence agencies of the United States.

**(6)** This subsection shall not apply with respect to any firearm manufactured in, imported into, or possessed in the United States before the date of the enactment of the Undetectable Firearms Act of 1988.

**(q)(1)** The Congress finds and declares that--

**(A)** crime, particularly crime involving drugs and guns, is a pervasive, nationwide problem;

**(B)** crime at the local level is exacerbated by the interstate movement of drugs, guns, and criminal gangs;

USCA Case #14-3089     Document #1638936     Filed: 10/03/2016     Page 50 of 72

**(C)** firearms and ammunition move easily in interstate commerce and have been found in increasing numbers in and around schools, as documented in numerous hearings in both the Committee on the Judiciary the [3] House of Representatives and the Committee on the Judiciary of the Senate;

**(D)** in fact, even before the sale of a firearm, the gun, its component parts, ammunition, and the raw materials from which they are made have considerably moved in interstate commerce;

**(E)** while criminals freely move from State to State, ordinary citizens and foreign visitors may fear to travel to or through certain parts of the country due to concern about violent crime and gun violence, and parents may decline to send their children to school for the same reason;

**(F)** the occurrence of violent crime in school zones has resulted in a decline in the quality of education in our country;

**(G)** this decline in the quality of education has an adverse impact on interstate commerce and the foreign commerce of the United States;

**(H)** States, localities, and school systems find it almost impossible to handle gun-related crime by themselves--even States, localities, and school systems that have made strong efforts to prevent, detect, and punish gun-related crime find their efforts unavailing due in part to the failure or inability of other States or localities to take strong measures; and

**(I)** the Congress has the power, under the interstate commerce clause and other provisions of the Constitution, to enact measures to ensure the integrity and safety of the Nation's schools by enactment of this subsection.

**(2)(A)** It shall be unlawful for any individual knowingly to possess a firearm that has moved in or that otherwise affects interstate or foreign commerce at a place that the individual knows, or has reasonable cause to believe, is a school zone.

**(B)** Subparagraph (A) does not apply to the possession of a firearm--

**(i)** on private property not part of school grounds;

**(ii)** if the individual possessing the firearm is licensed to do so by the State in which the school zone is located or a political subdivision of the State, and the law of the State or political subdivision requires that, before an individual obtains such a license, the law enforcement authorities of the State or political subdivision verify that the individual is qualified under law to receive the license;

**(iii)** that is--

**(I)** not loaded; and

**(II)** in a locked container, or a locked firearms rack that is on a motor vehicle;

**(iv)** by an individual for use in a program approved by a school in the school zone;

**(v)** by an individual in accordance with a contract entered into between a school in the school zone and the individual or an employer of the individual;

**(vi)** by a law enforcement officer acting in his or her official capacity; or

**(vii)** that is unloaded and is possessed by an individual while traversing school premises for the purpose of gaining access to public or private lands open to hunting, if the entry on school premises is authorized by school authorities.

**(3)(A)** Except as provided in subparagraph (B), it shall be unlawful for any person, knowingly or with reckless disregard for the safety of another, to discharge or attempt to discharge a firearm that has moved in or that otherwise affects interstate or foreign commerce at a place that the person knows is a school zone.

**(B)** Subparagraph (A) does not apply to the discharge of a firearm--

**(i)** on private property not part of school grounds;

**(ii)** as part of a program approved by a school in the school zone, by an individual who is participating in the program;

**(iii)** by an individual in accordance with a contract entered into between a school in a school zone and the individual or an employer of the individual; or

**(iv)** by a law enforcement officer acting in his or her official capacity.

**(4)** Nothing in this subsection shall be construed as preempting or preventing a State or local government from enacting a statute establishing gun free school zones as provided in this subsection.

**(r)** It shall be unlawful for any person to assemble from imported parts any semiautomatic rifle or any shotgun which is identical to any rifle or shotgun prohibited from importation under section 925(d)(3) of this chapter as not being particularly suitable for or readily adaptable to sporting purposes except that this subsection shall not apply to--

**(1)** the assembly of any such rifle or shotgun for sale or distribution by a licensed manufacturer to the United States or any department or agency thereof or to any State or any department, agency, or political subdivision thereof; or

**(2)** the assembly of any such rifle or shotgun for the purposes of testing or experimentation authorized by the Attorney General.

**(s)(1)** Beginning on the date that is 90 days after the date of enactment of this subsection and ending on the day before the date that is 60 months after such date of enactment, it shall be unlawful for any licensed importer, licensed manufacturer, or licensed dealer to sell, deliver, or transfer a handgun (other than the return of a handgun to the person from whom it was received) to an individual who is not licensed under section 923, unless--

**(A)** after the most recent proposal of such transfer by the transferee--

**(i)** the transferor has--

**(I)** received from the transferee a statement of the transferee containing the information described in paragraph (3);

**(II)** verified the identity of the transferee by examining the identification document presented;

**(III)** within 1 day after the transferee furnishes the statement, provided notice of the contents of the statement to the chief law enforcement officer of the place of residence of the transferee; and

**(IV)** within 1 day after the transferee furnishes the statement, transmitted a copy of the statement to the chief law enforcement officer of the place of residence of the transferee; and

**(ii)(I)** 5 business days (meaning days on which State offices are open) have elapsed from the date the transferor furnished notice of the contents of the statement to the chief law enforcement officer, during which period the transferor has not received information from the chief law enforcement officer that receipt or possession of the handgun by the transferee would be in violation of Federal, State, or local law; or

**(II)** the transferor has received notice from the chief law enforcement officer that the officer has no information indicating that receipt or possession of the handgun by the transferee would violate Federal, State, or local law;

**(B)** the transferee has presented to the transferor a written statement, issued by the chief law enforcement officer of the place of residence of the transferee during the 10-day period ending on the date of the most recent proposal of such transfer by the transferee, stating that the transferee requires access to a handgun because of a threat to the life of the transferee or of any member of the household of the transferee;

**(C)(i)** the transferee has presented to the transferor a permit that--

**(I)** allows the transferee to possess or acquire a handgun; and

A-13

**(II)** was issued not more than 5 years earlier by the State in which the transfer is to take place; and

**(ii)** the law of the State provides that such a permit is to be issued only after an authorized government official has verified that the information available to such official does not indicate that possession of a handgun by the transferee would be in violation of the law;

**(D)** the law of the State requires that, before any licensed importer, licensed manufacturer, or licensed dealer completes the transfer of a handgun to an individual who is not licensed under section 923, an authorized government official verify that the information available to such official does not indicate that possession of a handgun by the transferee would be in violation of law;

**(E)** the Attorney General has approved the transfer under section 5812 of the Internal Revenue Code of 1986; or

**(F)** on application of the transferor, the Attorney General has certified that compliance with subparagraph (A)(i)(III) is impracticable because--

**(i)** the ratio of the number of law enforcement officers of the State in which the transfer is to occur to the number of square miles of land area of the State does not exceed 0.0025;

**(ii)** the business premises of the transferor at which the transfer is to occur are extremely remote in relation to the chief law enforcement officer; and

**(iii)** there is an absence of telecommunications facilities in the geographical area in which the business premises are located.

**(2)** A chief law enforcement officer to whom a transferor has provided notice pursuant to paragraph (1)(A)(i)(III) shall make a reasonable effort to ascertain within 5 business days whether receipt or possession would be in violation of the law, including research in whatever State and local recordkeeping systems are available and in a national system designated by the Attorney General.

**(3)** The statement referred to in paragraph (1)(A)(i)(I) shall contain only--

**(A)** the name, address, and date of birth appearing on a valid identification document (as defined in section 1028(d)(1)) of the transferee containing a photograph of the transferee and a description of the identification used;

**(B)** a statement that the transferee--

**(i)** is not under indictment for, and has not been convicted in any court of, a crime punishable by imprisonment for a term exceeding 1 year, and has not been convicted in any court of a misdemeanor crime of domestic violence;

A-14

**(ii)** is not a fugitive from justice;

**(iii)** is not an unlawful user of or addicted to any controlled substance (as defined in section 102 of the Controlled Substances Act);

**(iv)** has not been adjudicated as a mental defective or been committed to a mental institution;

**(v)** is not an alien who--

  **(I)** is illegally or unlawfully in the United States; or

  **(II)** subject to subsection (y)(2), has been admitted to the United States under a nonimmigrant visa (as that term is defined in section 101(a)(26) of the Immigration and Nationality Act (8 U.S.C. 1101(a)(26)));

**(vi)** has not been discharged from the Armed Forces under dishonorable conditions; and

**(vii)** is not a person who, having been a citizen of the United States, has renounced such citizenship;

**(C)** the date the statement is made; and

**(D)** notice that the transferee intends to obtain a handgun from the transferor.

**(4)** Any transferor of a handgun who, after such transfer, receives a report from a chief law enforcement officer containing information that receipt or possession of the handgun by the transferee violates Federal, State, or local law shall, within 1 business day after receipt of such request, communicate any information related to the transfer that the transferor has about the transfer and the transferee to--

  **(A)** the chief law enforcement officer of the place of business of the transferor; and

  **(B)** the chief law enforcement officer of the place of residence of the transferee.

**(5)** Any transferor who receives information, not otherwise available to the public, in a report under this subsection shall not disclose such information except to the transferee, to law enforcement authorities, or pursuant to the direction of a court of law.

**(6)(A)** Any transferor who sells, delivers, or otherwise transfers a handgun to a transferee shall retain the copy of the statement of the transferee with respect to the handgun transaction, and shall retain evidence that the transferor has complied with subclauses (III) and (IV) of paragraph (1)(A)(i) with respect to the statement.

**(B)** Unless the chief law enforcement officer to whom a statement is transmitted under paragraph (1)(A)(i)(IV) determines that a transaction would violate Federal, State, or local law--

**(i)** the officer shall, within 20 business days after the date the transferee made the statement on the basis of which the notice was provided, destroy the statement, any record containing information derived from the statement, and any record created as a result of the notice required by paragraph (1)(A)(i)(III);

**(ii)** the information contained in the statement shall not be conveyed to any person except a person who has a need to know in order to carry out this subsection; and

**(iii)** the information contained in the statement shall not be used for any purpose other than to carry out this subsection.

**(C)** If a chief law enforcement officer determines that an individual is ineligible to receive a handgun and the individual requests the officer to provide the reason for such determination, the officer shall provide such reasons to the individual in writing within 20 business days after receipt of the request.

**(7)** A chief law enforcement officer or other person responsible for providing criminal history background information pursuant to this subsection shall not be liable in an action at law for damages--

**(A)** for failure to prevent the sale or transfer of a handgun to a person whose receipt or possession of the handgun is unlawful under this section; or

**(B)** for preventing such a sale or transfer to a person who may lawfully receive or possess a handgun.

**(8)** For purposes of this subsection, the term "chief law enforcement officer" means the chief of police, the sheriff, or an equivalent officer or the designee of any such individual.

**(9)** The Attorney General shall take necessary actions to ensure that the provisions of this subsection are published and disseminated to licensed dealers, law enforcement officials, and the public.

**(t)(1)** Beginning on the date that is 30 days after the Attorney General notifies licensees under section 103(d) of the Brady Handgun Violence Prevention Act that the national instant criminal background check system is established, a licensed importer, licensed manufacturer, or licensed dealer shall not transfer a firearm to any other person who is not licensed under this chapter, unless--

**(A)** before the completion of the transfer, the licensee contacts the national instant criminal background check system established under section 103 of that Act;

**(B)(i)** the system provides the licensee with a unique identification number; or

**(ii)** 3 business days (meaning a day on which State offices are open) have elapsed since the licensee contacted the system, and the system has not notified the licensee that the receipt of a firearm by such other person would violate subsection (g) or (n) of this section; and

**(C)** the transferor has verified the identity of the transferee by examining a valid identification document (as defined in section 1028(d) of this title) of the transferee containing a photograph of the transferee.

**(2)** If receipt of a firearm would not violate subsection (g) or (n) or State law, the system shall--

**(A)** assign a unique identification number to the transfer;

**(B)** provide the licensee with the number; and

**(C)** destroy all records of the system with respect to the call (other than the identifying number and the date the number was assigned) and all records of the system relating to the person or the transfer.

**(3)** Paragraph (1) shall not apply to a firearm transfer between a licensee and another person if--

**(A)(i)** such other person has presented to the licensee a permit that--

**(I)** allows such other person to possess or acquire a firearm; and

**(II)** was issued not more than 5 years earlier by the State in which the transfer is to take place; and

**(ii)** the law of the State provides that such a permit is to be issued only after an authorized government official has verified that the information available to such official does not indicate that possession of a firearm by such other person would be in violation of law;

**(B)** the Attorney General has approved the transfer under section 5812 of the Internal Revenue Code of 1986; or

**(C)** on application of the transferor, the Attorney General has certified that compliance with paragraph (1)(A) is impracticable because--

**(i)** the ratio of the number of law enforcement officers of the State in which the transfer is to occur to the number of square miles of land area of the State does not exceed 0.0025;

(ii) the business premises of the licensee at which the transfer is to occur are extremely remote in relation to the chief law enforcement officer (as defined in subsection (s)(8)); and

(iii) there is an absence of telecommunications facilities in the geographical area in which the business premises are located.

**(4)** If the national instant criminal background check system notifies the licensee that the information available to the system does not demonstrate that the receipt of a firearm by such other person would violate subsection (g) or (n) or State law, and the licensee transfers a firearm to such other person, the licensee shall include in the record of the transfer the unique identification number provided by the system with respect to the transfer.

**(5)** If the licensee knowingly transfers a firearm to such other person and knowingly fails to comply with paragraph (1) of this subsection with respect to the transfer and, at the time such other person most recently proposed the transfer, the national instant criminal background check system was operating and information was available to the system demonstrating that receipt of a firearm by such other person would violate subsection (g) or (n) of this section or State law, the Attorney General may, after notice and opportunity for a hearing, suspend for not more than 6 months or revoke any license issued to the licensee under section 923, and may impose on the licensee a civil fine of not more than $5,000.

**(6)** Neither a local government nor an employee of the Federal Government or of any State or local government, responsible for providing information to the national instant criminal background check system shall be liable in an action at law for damages--

**(A)** for failure to prevent the sale or transfer of a firearm to a person whose receipt or possession of the firearm is unlawful under this section; or

**(B)** for preventing such a sale or transfer to a person who may lawfully receive or possess a firearm.

**(u)** It shall be unlawful for a person to steal or unlawfully take or carry away from the person or the premises of a person who is licensed to engage in the business of importing, manufacturing, or dealing in firearms, any firearm in the licensee's business inventory that has been shipped or transported in interstate or foreign commerce.

**[(v), (w)** Repealed. Pub.L. 103-322, Title XI, § 110105(2), Sept. 13, 1994, 108 Stat. 2000.]

**(x)(1)** It shall be unlawful for a person to sell, deliver, or otherwise transfer to a person who the transferor knows or has reasonable cause to believe is a juvenile--

**(A)** a handgun; or

**(B)** ammunition that is suitable for use only in a handgun.

**(2)** It shall be unlawful for any person who is a juvenile to knowingly possess--

   **(A)** a handgun; or

   **(B)** ammunition that is suitable for use only in a handgun.

**(3)** This subsection does not apply to--

   **(A)** a temporary transfer of a handgun or ammunition to a juvenile or to the possession or use of a handgun or ammunition by a juvenile if the handgun and ammunition are possessed and used by the juvenile--

      **(i)** in the course of employment, in the course of ranching or farming related to activities at the residence of the juvenile (or on property used for ranching or farming at which the juvenile, with the permission of the property owner or lessee, is performing activities related to the operation of the farm or ranch), target practice, hunting, or a course of instruction in the safe and lawful use of a handgun;

      **(ii)** with the prior written consent of the juvenile's parent or guardian who is not prohibited by Federal, State, or local law from possessing a firearm, except--

         **(I)** during transportation by the juvenile of an unloaded handgun in a locked container directly from the place of transfer to a place at which an activity described in clause (i) is to take place and transportation by the juvenile of that handgun, unloaded and in a locked container, directly from the place at which such an activity took place to the transferor; or

         **(II)** with respect to ranching or farming activities as described in clause (i), a juvenile may possess and use a handgun or ammunition with the prior written approval of the juvenile's parent or legal guardian and at the direction of an adult who is not prohibited by Federal, State or local law from possessing a firearm;

      **(iii)** the juvenile has the prior written consent in the juvenile's possession at all times when a handgun is in the possession of the juvenile; and

      **(iv)** in accordance with State and local law;

   **(B)** a juvenile who is a member of the Armed Forces of the United States or the National Guard who possesses or is armed with a handgun in the line of duty;

   **(C)** a transfer by inheritance of title (but not possession) of a handgun or ammunition to a juvenile; or

A-19

**(D)** the possession of a handgun or ammunition by a juvenile taken in defense of the juvenile or other persons against an intruder into the residence of the juvenile or a residence in which the juvenile is an invited guest.

**(4)** A handgun or ammunition, the possession of which is transferred to a juvenile in circumstances in which the transferor is not in violation of this subsection shall not be subject to permanent confiscation by the Government if its possession by the juvenile subsequently becomes unlawful because of the conduct of the juvenile, but shall be returned to the lawful owner when such handgun or ammunition is no longer required by the Government for the purposes of investigation or prosecution.

**(5)** For purposes of this subsection, the term "juvenile" means a person who is less than 18 years of age.

**(6)(A)** In a prosecution of a violation of this subsection, the court shall require the presence of a juvenile defendant's parent or legal guardian at all proceedings.

**(B)** The court may use the contempt power to enforce subparagraph (A).

**(C)** The court may excuse attendance of a parent or legal guardian of a juvenile defendant at a proceeding in a prosecution of a violation of this subsection for good cause shown.

**(y) Provisions relating to aliens admitted under nonimmigrant visas--**

**(1) Definitions.**--In this subsection--

**(A)** the term "alien" has the same meaning as in section 101(a)(3) of the Immigration and Nationality Act (8 U.S.C. 1101(a)(3)); and

**(B)** the term "nonimmigrant visa" has the same meaning as in section 101(a)(26) of the Immigration and Nationality Act (8 U.S.C. 1101(a)(26)).

**(2) Exceptions.**--Subsections (d)(5)(B), (g)(5)(B), and (s)(3)(B)(v)(II) do not apply to any alien who has been lawfully admitted to the United States under a nonimmigrant visa, if that alien is--

**(A)** admitted to the United States for lawful hunting or sporting purposes or is in possession of a hunting license or permit lawfully issued in the United States;

**(B)** an official representative of a foreign government who is--

**(i)** accredited to the United States Government or the Government's mission to an international organization having its headquarters in the United States; or

A-20

USCA Case #14-3089     Document #1638936     Filed: 10/03/2016     Page 60 of 72

**(ii)** en route to or from another country to which that alien is accredited;

**(C)** an official of a foreign government or a distinguished foreign visitor who has been so designated by the Department of State; or

**(D)** a foreign law enforcement officer of a friendly foreign government entering the United States on official law enforcement business.

**(3) Waiver--**

**(A) Conditions for waiver.--**Any individual who has been admitted to the United States under a nonimmigrant visa may receive a waiver from the requirements of subsection (g)(5), if--

**(i)** the individual submits to the Attorney General a petition that meets the requirements of subparagraph (C); and

**(ii)** the Attorney General approves the petition.

**(B) Petition.--**Each petition under subparagraph (B) shall--

**(i)** demonstrate that the petitioner has resided in the United States for a continuous period of not less than 180 days before the date on which the petition is submitted under this paragraph; and

**(ii)** include a written statement from the embassy or consulate of the petitioner, authorizing the petitioner to acquire a firearm or ammunition and certifying that the alien would not, absent the application of subsection (g)(5)(B), otherwise be prohibited from such acquisition under subsection (g).

**(C) Approval of petition.--**The Attorney General shall approve a petition submitted in accordance with this paragraph, if the Attorney General determines that waiving the requirements of subsection (g)(5)(B) with respect to the petitioner--

**(i)** would be in the interests of justice; and

**(ii)** would not jeopardize the public safety.

**(z) Secure gun storage or safety device.--**

USCA Case #14-3089     Document #1638936     Filed: 10/03/2016     Page 61 of 72

**(1)  In general.**--Except as provided under paragraph (2), it shall be unlawful for any licensed importer, licensed manufacturer, or licensed dealer to sell, deliver, or transfer any handgun to any person other than any person licensed under this chapter, unless the transferee is provided with a secure gun storage or safety device (as defined in section 921(a)(34)) for that handgun.

**(2)  Exceptions.**--Paragraph (1) shall not apply to--

**(A)(i)** the manufacture for, transfer to, or possession by, the United States, a department or agency of the United States, a State, or a department, agency, or political subdivision of a State, of a handgun; or

**(ii)** the transfer to, or possession by, a law enforcement officer employed by an entity referred to in clause (i) of a handgun for law enforcement purposes (whether on or off duty); or

**(B)** the transfer to, or possession by, a rail police officer directly employed by or contracted by a rail carrier and certified or commissioned as a police officer under the laws of a State of a handgun for purposes of law enforcement (whether on or off duty);

**(C)** the transfer to any person of a handgun listed as a curio or relic by the Secretary pursuant to section 921(a)(13); or

**(D)** the transfer to any person of a handgun for which a secure gun storage or safety device is temporarily unavailable for the reasons described in the exceptions stated in section 923(e), if the licensed manufacturer, licensed importer, or licensed dealer delivers to the transferee within 10 calendar days from the date of the delivery of the handgun to the transferee a secure gun storage or safety device for the handgun.

**(3)  Liability for use.**--

**(A)  In general.**--Notwithstanding any other provision of law, a person who has lawful possession and control of a handgun, and who uses a secure gun storage or safety device with the handgun, shall be entitled to immunity from a qualified civil liability action.

**(B)  Prospective actions.**--A qualified civil liability action may not be brought in any Federal or State court.

**(C)  Defined term.**--As used in this paragraph, the term "qualified civil liability action"--

**(i)**  means a civil action brought by any person against a person described in subparagraph (A) for damages resulting from the criminal or unlawful misuse of the handgun by a third party, if--

**(I)** the handgun was accessed by another person who did not have the permission or authorization of the person having lawful possession and control of the handgun to have access to it; and

**(II)** at the time access was gained by the person not so authorized, the handgun had been made inoperable by use of a secure gun storage or safety device; and

**(ii)** shall not include an action brought against the person having lawful possession and control of the handgun for negligent entrustment or negligence per se.

### [APPENDIX A Repealed. Pub.L. 103-322, Title XI, § 110105(2), Sept. 13, 1994, 108 Stat. 2000]

**CREDIT(S)**

(Added Pub.L. 90-351, Title IV, § 902, June 19, 1968, 82 Stat. 228; amended Pub.L. 90-618, Title I, § 102, Oct. 22, 1968, 82 Stat. 1216; Pub.L. 97-377, Title I, § 165(a), Dec. 21, 1982, 96 Stat. 1923; Pub.L. 99-308, § 102, May 19, 1986, 100 Stat. 451; Pub.L. 99-408, § 2, Aug. 28, 1986, 100 Stat. 920; Pub.L. 100-649, § 2(a), (f)(2)(A), Nov. 10, 1988, 102 Stat. 3816, 3818; Pub.L. 100-690, Title VII, § 7060(c), Nov. 18, 1988, 102 Stat. 4404; Pub.L. 101-647, Title XVII, § 1702(b)(1), Title XXII, §§ 2201, 2202, 2204(b), Title XXXV, § 3524, Nov. 29, 1990, 104 Stat. 4844, 4856, 4857, 4924; Pub.L. 103-159, Title I, § 102(a)(1), (b), Title III, § 302(a) to (c), Nov. 30, 1993, 107 Stat. 1536, 1539, 1545; Pub.L. 103-322, Title XI, §§ 110102(a), 110103(a), 110105(2), 110106, 110201(a), 110401(b), (c), 110511, 110514, Title XXXII, §§ 320904, 320927, Title XXXIII, § 330011(i), Sept. 13, 1994, 108 Stat. 1996, 1998, 2000, 2010, 2014, 2019, 2125, 2131, 2145; Pub.L. 104-208, Div. A, Title I, § 101(f) [Title VI, §§ 657, 658(b)], Sept. 30, 1996, 110 Stat. 3009-369, 3009-372; Pub.L. 104-294, Title VI, § 603(b), (c)(1), (d) to (f)(1), (g), Oct. 11, 1996, 110 Stat. 3503, 3504; Pub.L. 105-277, Div. A, § 101(b) [Title I, § 121], Oct. 21, 1998, 112 Stat. 2681-71; Pub.L. 107-273, Div. B, Title IV, § 4003(a)(1), Nov. 2, 2002, 116 Stat. 1811; Pub.L. 107-296, Title XI, § 1112(f)(4), (6), Nov. 25, 2002, 116 Stat. 2276; Pub.L. 109-92, §§ 5(c)(1), 6(a), Oct. 26, 2005, 119 Stat. 2099, 2101; Pub.L. 114-94, Div. A, Title XI, § 11412(c)(2), Dec. 4, 2015, 129 Stat. 1688.)

Footnotes

1    So in original. Probably should be followed with "and".

2    So in original. The word "who" probably should not appear.

3    So in original. Probably should be "of the".

18 U.S.C.A. § 922, 18 USCA § 922

Current through P.L. 114-221.

**End of Document**                    © 2016 Thomson Reuters. No claim to original U.S. Government Works.

A-23

■ KeyCite Red Flag - Severe Negative Treatment
Unconstitutional or PreemptedHeld Unconstitutional by United States v. Baires-Reyes, N.D.Cal., June 07, 2016

■ KeyCite Yellow Flag - Negative TreatmentProposed Legislation

United States Code Annotated
  Title 18. Crimes and Criminal Procedure (Refs & Annos)
    Part I. Crimes (Refs & Annos)
      Chapter 44. Firearms (Refs & Annos)

18 U.S.C.A. § 924

§ 924. Penalties

Effective: October 6, 2006

Currentness

**(a)(1)** Except as otherwise provided in this subsection, subsection (b), (c), (f), or (p) of this section, or in section 929, whoever--

**(A)** knowingly makes any false statement or representation with respect to the information required by this chapter to be kept in the records of a person licensed under this chapter or in applying for any license or exemption or relief from disability under the provisions of this chapter;

**(B)** knowingly violates subsection (a)(4), (f), (k), or (q) of section 922;

**(C)** knowingly imports or brings into the United States or any possession thereof any firearm or ammunition in violation of section 922(l); or

**(D)** willfully violates any other provision of this chapter,

shall be fined under this title, imprisoned not more than five years, or both.

**(2)** Whoever knowingly violates subsection (a)(6), (d), (g), (h), (i), (j), or (o) of section 922 shall be fined as provided in this title, imprisoned not more than 10 years, or both.

**(3)** Any licensed dealer, licensed importer, licensed manufacturer, or licensed collector who knowingly--

**(A)** makes any false statement or representation with respect to the information required by the provisions of this chapter to be kept in the records of a person licensed under this chapter, or

**(B)** violates subsection (m) of section 922,

shall be fined under this title, imprisoned not more than one year, or both.

A-24

**(4)** Whoever violates section 922(q) shall be fined under this title, imprisoned for not more than 5 years, or both. Notwithstanding any other provision of law, the term of imprisonment imposed under this paragraph shall not run concurrently with any other term of imprisonment imposed under any other provision of law. Except for the authorization of a term of imprisonment of not more than 5 years made in this paragraph, for the purpose of any other law a violation of section 922(q) shall be deemed to be a misdemeanor.

**(5)** Whoever knowingly violates subsection (s) or (t) of section 922 shall be fined under this title, imprisoned for not more than 1 year, or both.

**(6)(A)(i)** A juvenile who violates section 922(x) shall be fined under this title, imprisoned not more than 1 year, or both, except that a juvenile described in clause (ii) shall be sentenced to probation on appropriate conditions and shall not be incarcerated unless the juvenile fails to comply with a condition of probation.

**(ii)** A juvenile is described in this clause if--

**(I)** the offense of which the juvenile is charged is possession of a handgun or ammunition in violation of section 922(x)(2); and

**(II)** the juvenile has not been convicted in any court of an offense (including an offense under section 922(x) or a similar State law, but not including any other offense consisting of conduct that if engaged in by an adult would not constitute an offense) or adjudicated as a juvenile delinquent for conduct that if engaged in by an adult would constitute an offense.

**(B)** A person other than a juvenile who knowingly violates section 922(x)--

**(i)** shall be fined under this title, imprisoned not more than 1 year, or both; and

**(ii)** if the person sold, delivered, or otherwise transferred a handgun or ammunition to a juvenile knowing or having reasonable cause to know that the juvenile intended to carry or otherwise possess or discharge or otherwise use the handgun or ammunition in the commission of a crime of violence, shall be fined under this title, imprisoned not more than 10 years, or both.

**(7)** Whoever knowingly violates section 931 shall be fined under this title, imprisoned not more than 3 years, or both.

**(b)** Whoever, with intent to commit therewith an offense punishable by imprisonment for a term exceeding one year, or with knowledge or reasonable cause to believe that an offense punishable by imprisonment for a term exceeding one year is to be committed therewith, ships, transports, or receives a firearm or any ammunition in interstate or foreign commerce shall be fined under this title, or imprisoned not more than ten years, or both.

**(c)(1)(A)** Except to the extent that a greater minimum sentence is otherwise provided by this subsection or by any other provision of law, any person who, during and in relation to any crime of violence or drug trafficking crime (including a crime of violence or drug trafficking crime that provides for an enhanced punishment if committed by the use of a deadly or dangerous weapon or device) for which the person may be prosecuted in a court of the United States, uses or carries a firearm, or who, in furtherance of any such crime, possesses a firearm, shall, in addition to the punishment provided for such crime of violence or drug trafficking crime--

**(i)** be sentenced to a term of imprisonment of not less than 5 years;

**(ii)** if the firearm is brandished, be sentenced to a term of imprisonment of not less than 7 years; and

**(iii)** if the firearm is discharged, be sentenced to a term of imprisonment of not less than 10 years.

**(B)** If the firearm possessed by a person convicted of a violation of this subsection--

**(i)** is a short-barreled rifle, short-barreled shotgun, or semiautomatic assault weapon, the person shall be sentenced to a term of imprisonment of not less than 10 years; or

**(ii)** is a machinegun or a destructive device, or is equipped with a firearm silencer or firearm muffler, the person shall be sentenced to a term of imprisonment of not less than 30 years.

**(C)** In the case of a second or subsequent conviction under this subsection, the person shall--

**(i)** be sentenced to a term of imprisonment of not less than 25 years; and

**(ii)** if the firearm involved is a machinegun or a destructive device, or is equipped with a firearm silencer or firearm muffler, be sentenced to imprisonment for life.

**(D)** Notwithstanding any other provision of law--

**(i)** a court shall not place on probation any person convicted of a violation of this subsection; and

**(ii)** no term of imprisonment imposed on a person under this subsection shall run concurrently with any other term of imprisonment imposed on the person, including any term of imprisonment imposed for the crime of violence or drug trafficking crime during which the firearm was used, carried, or possessed.

**(2)** For purposes of this subsection, the term "drug trafficking crime" means any felony punishable under the Controlled Substances Act (21 U.S.C. 801 et seq.), the Controlled Substances Import and Export Act (21 U.S.C. 951 et seq.), or chapter 705 of title 46.

A-26

**(3)** For purposes of this subsection the term "crime of violence" means an offense that is a felony and--

**(A)** has as an element the use, attempted use, or threatened use of physical force against the person or property of another, or

**(B)** that by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense.

**(4)** For purposes of this subsection, the term "brandish" means, with respect to a firearm, to display all or part of the firearm, or otherwise make the presence of the firearm known to another person, in order to intimidate that person, regardless of whether the firearm is directly visible to that person.

**(5)** Except to the extent that a greater minimum sentence is otherwise provided under this subsection, or by any other provision of law, any person who, during and in relation to any crime of violence or drug trafficking crime (including a crime of violence or drug trafficking crime that provides for an enhanced punishment if committed by the use of a deadly or dangerous weapon or device) for which the person may be prosecuted in a court of the United States, uses or carries armor piercing ammunition, or who, in furtherance of any such crime, possesses armor piercing ammunition, shall, in addition to the punishment provided for such crime of violence or drug trafficking crime or conviction under this section--

**(A)** be sentenced to a term of imprisonment of not less than 15 years; and

**(B)** if death results from the use of such ammunition--

**(i)** if the killing is murder (as defined in section 1111), be punished by death or sentenced to a term of imprisonment for any term of years or for life; and

**(ii)** if the killing is manslaughter (as defined in section 1112), be punished as provided in section 1112.

**(d)(1)** Any firearm or ammunition involved in or used in any knowing violation of subsection (a)(4), (a)(6), (f), (g), (h), (i), (j), or (k) of section 922, or knowing importation or bringing into the United States or any possession thereof any firearm or ammunition in violation of section 922(l), or knowing violation of section 924, or willful violation of any other provision of this chapter or any rule or regulation promulgated thereunder, or any violation of any other criminal law of the United States, or any firearm or ammunition intended to be used in any offense referred to in paragraph (3) of this subsection, where such intent is demonstrated by clear and convincing evidence, shall be subject to seizure and forfeiture, and all provisions of the Internal Revenue Code of 1986 relating to the seizure, forfeiture, and disposition of firearms, as defined in section 5845(a) of that Code, shall, so far as applicable, extend to seizures and forfeitures under the provisions of this chapter: *Provided,* That upon acquittal of the owner or possessor, or dismissal of the charges against him other than upon motion of the Government prior to trial, or lapse of or court termination of the restraining order to which he is subject, the seized or relinquished firearms or ammunition shall be returned forthwith to the owner or possessor or to a person delegated by the owner or possessor unless the return of the firearms or ammunition would place the owner

or possessor or his delegate in violation of law. Any action or proceeding for the forfeiture of firearms or ammunition shall be commenced within one hundred and twenty days of such seizure.

**(2)(A)** In any action or proceeding for the return of firearms or ammunition seized under the provisions of this chapter, the court shall allow the prevailing party, other than the United States, a reasonable attorney's fee, and the United States shall be liable therefor.

**(B)** In any other action or proceeding under the provisions of this chapter, the court, when it finds that such action was without foundation, or was initiated vexatiously, frivolously, or in bad faith, shall allow the prevailing party, other than the United States, a reasonable attorney's fee, and the United States shall be liable therefor.

**(C)** Only those firearms or quantities of ammunition particularly named and individually identified as involved in or used in any violation of the provisions of this chapter or any rule or regulation issued thereunder, or any other criminal law of the United States or as intended to be used in any offense referred to in paragraph (3) of this subsection, where such intent is demonstrated by clear and convincing evidence, shall be subject to seizure, forfeiture, and disposition.

**(D)** The United States shall be liable for attorneys' fees under this paragraph only to the extent provided in advance by appropriation Acts.

**(3)** The offenses referred to in paragraphs (1) and (2)(C) of this subsection are--

**(A)** any crime of violence, as that term is defined in section 924(c)(3) of this title;

**(B)** any offense punishable under the Controlled Substances Act (21 U.S.C. 801 et seq.) or the Controlled Substances Import and Export Act (21 U.S.C. 951 et seq.);

**(C)** any offense described in section 922(a)(1), 922(a)(3), 922(a)(5), or 922(b)(3) of this title, where the firearm or ammunition intended to be used in any such offense is involved in a pattern of activities which includes a violation of any offense described in section 922(a)(1), 922(a)(3), 922(a)(5), or 922(b)(3) of this title;

**(D)** any offense described in section 922(d) of this title where the firearm or ammunition is intended to be used in such offense by the transferor of such firearm or ammunition;

**(E)** any offense described in section 922(i), 922(j), 922(l), 922(n), or 924(b) of this title; and

**(F)** any offense which may be prosecuted in a court of the United States which involves the exportation of firearms or ammunition.

**(e)(1)** In the case of a person who violates section 922(g) of this title and has three previous convictions by any court referred to in section 922(g)(1) of this title for a violent felony or a serious drug offense, or both, committed on occasions different from one another, such person shall be fined under this title and imprisoned not less than fifteen years, and,

A-28

notwithstanding any other provision of law, the court shall not suspend the sentence of, or grant a probationary sentence to, such person with respect to the conviction under section 922(g).

**(2)** As used in this subsection--

**(A)** the term "serious drug offense" means--

**(i)** an offense under the Controlled Substances Act (21 U.S.C. 801 et seq.), the Controlled Substances Import and Export Act (21 U.S.C. 951 et seq.), or chapter 705 of title 46, for which a maximum term of imprisonment of ten years or more is prescribed by law; or

**(ii)** an offense under State law, involving manufacturing, distributing, or possessing with intent to manufacture or distribute, a controlled substance (as defined in section 102 of the Controlled Substances Act (21 U.S.C. 802)), for which a maximum term of imprisonment of ten years or more is prescribed by law;

**(B)** the term "violent felony" means any crime punishable by imprisonment for a term exceeding one year, or any act of juvenile delinquency involving the use or carrying of a firearm, knife, or destructive device that would be punishable by imprisonment for such term if committed by an adult, that--

**(i)** has as an element the use, attempted use, or threatened use of physical force against the person of another; or

**(ii)** is burglary, arson, or extortion, involves use of explosives, or otherwise involves conduct that presents a serious potential risk of physical injury to another; and

**(C)** the term "conviction" includes a finding that a person has committed an act of juvenile delinquency involving a violent felony.

**(f)** In the case of a person who knowingly violates section 922(p), such person shall be fined under this title, or imprisoned not more than 5 years, or both.

**(g)** Whoever, with the intent to engage in conduct which--

**(1)** constitutes an offense listed in section 1961(1),

**(2)** is punishable under the Controlled Substances Act (21 U.S.C. 801 et seq.), the Controlled Substances Import and Export Act (21 U.S.C. 951 et seq.), or chapter 705 of title 46,

**(3)** violates any State law relating to any controlled substance (as defined in section 102(6) of the Controlled Substances Act (21 U.S.C. 802(6))), or

**(4)** constitutes a crime of violence (as defined in subsection (c)(3)),

travels from any State or foreign country into any other State and acquires, transfers, or attempts to acquire or transfer, a firearm in such other State in furtherance of such purpose, shall be imprisoned not more than 10 years, fined in accordance with this title, or both.

**(h)** Whoever knowingly transfers a firearm, knowing that such firearm will be used to commit a crime of violence (as defined in subsection (c)(3)) or drug trafficking crime (as defined in subsection (c)(2)) shall be imprisoned not more than 10 years, fined in accordance with this title, or both.

**(i)(1)** A person who knowingly violates section 922(u) shall be fined under this title, imprisoned not more than 10 years, or both.

**(2)** Nothing contained in this subsection shall be construed as indicating an intent on the part of Congress to occupy the field in which provisions of this subsection operate to the exclusion of State laws on the same subject matter, nor shall any provision of this subsection be construed as invalidating any provision of State law unless such provision is inconsistent with any of the purposes of this subsection.

**(j)** A person who, in the course of a violation of subsection (c), causes the death of a person through the use of a firearm, shall--

**(1)** if the killing is a murder (as defined in section 1111), be punished by death or by imprisonment for any term of years or for life; and

**(2)** if the killing is manslaughter (as defined in section 1112), be punished as provided in that section.

**(k)** A person who, with intent to engage in or to promote conduct that--

**(1)** is punishable under the Controlled Substances Act (21 U.S.C. 801 et seq.), the Controlled Substances Import and Export Act (21 U.S.C. 951 et seq.), or chapter 705 of title 46;

**(2)** violates any law of a State relating to any controlled substance (as defined in section 102 of the Controlled Substances Act, 21 U.S.C. 802); or

**(3)** constitutes a crime of violence (as defined in subsection (c)(3)),

smuggles or knowingly brings into the United States a firearm, or attempts to do so, shall be imprisoned not more than 10 years, fined under this title, or both.

**(l)** A person who steals any firearm which is moving as, or is a part of, or which has moved in, interstate or foreign commerce shall be imprisoned for not more than 10 years, fined under this title, or both.

**(m)** A person who steals any firearm from a licensed importer, licensed manufacturer, licensed dealer, or licensed collector shall be fined under this title, imprisoned not more than 10 years, or both.

**(n)** A person who, with the intent to engage in conduct that constitutes a violation of section 922(a)(1)(A), travels from any State or foreign country into any other State and acquires, or attempts to acquire, a firearm in such other State in furtherance of such purpose shall be imprisoned for not more than 10 years.

**(o)** A person who conspires to commit an offense under subsection (c) shall be imprisoned for not more than 20 years, fined under this title, or both; and if the firearm is a machinegun or destructive device, or is equipped with a firearm silencer or muffler, shall be imprisoned for any term of years or life.

**(p) Penalties relating to secure gun storage or safety device.--**

**(1) In general.--**

**(A) Suspension or revocation of license; civil penalties.--**With respect to each violation of section 922(z)(1) by a licensed manufacturer, licensed importer, or licensed dealer, the Secretary may, after notice and opportunity for hearing--

**(i)** suspend for not more than 6 months, or revoke, the license issued to the licensee under this chapter that was used to conduct the firearms transfer; or

**(ii)** subject the licensee to a civil penalty in an amount equal to not more than $2,500.

**(B) Review.--**An action of the Secretary under this paragraph may be reviewed only as provided under section 923(f).

**(2) Administrative remedies.--**The suspension or revocation of a license or the imposition of a civil penalty under paragraph (1) shall not preclude any administrative remedy that is otherwise available to the Secretary.

**CREDIT(S)**

(Added Pub.L. 90-351, Title IV, § 902, June 19, 1968, 82 Stat. 233; amended Pub.L. 90-618, Title I, § 102, Oct. 22, 1968, 82 Stat. 1223; Pub.L. 91-644, Title II, § 13, Jan. 2, 1971, 84 Stat. 1889; Pub.L. 98-473, Title II, §§ 223(a), 1005(a), Oct. 12, 1984, 98 Stat. 2028, 2138; Pub.L. 99-308, § 104(a), May 19, 1986, 100 Stat. 456; Pub.L. 99-570, Title I, § 1402, Oct. 27, 1986, 100 Stat. 3207-39; Pub.L. 100-649, § 2(b), (f)(2)(B), (D), Nov. 10, 1988, 102 Stat. 3817, 3818; Pub.L. 100-690, Title VI, §§ 6211, 6212, 6451, 6460, 6462, Title VII, §§ 7056, 7060(a), Nov. 18, 1988, 102 Stat. 4359, 4360, 4371, 4373, 4374, 4402, 4403; Pub.L. 101-647, Title XI, § 1101, Title XVII, § 1702(b)(3), Title XXII, §§ 2203(d), 2204(c), Title XXXV, §§ 3526, 3527, 3528, 3529, Nov. 29, 1990, 104 Stat. 4829, 4845, 4857, 4924; Pub.L. 103-159, Title I, § 102(c), Title III, § 302(d), Nov. 30, 1993, 107 Stat. 1541, 1545; Pub.L. 103-322, Title VI, § 60013, Title XI, §§ 110102(c), 110103(c), 110105(2), 110201(b), 110401(e), 110503, 110504(a), 110507, 110510, 110515(a), 110517, 110518(a), Title XXXIII, §§ 330002(h), 330003(f)(2), 330011(i), (j), 330016(1)(H), (K), (L), Sept. 13, 1994, 108 Stat. 1973, 1998, 1999, 2000, 2011, 2015, 2016, 2018, 2019, 2020, 2140, 2141, 2145, 2147; Pub.L. 104-294, Title VI, § 603(m)(1), (n) to (p)(1), (q) to (s), Oct. 11, 1996, 110 Stat. 3505; Pub.L. 105-386, § 1(a), Nov. 13, 1998, 112 Stat. 3469; Pub.L. 107-273, Div. B, Title IV, § 4002(d)(1)(E),

USCA Case #14-3089     Document #1638936          Filed: 10/03/2016     Page 71 of 72

Div. C, Title I, § 11009(e)(3), Nov. 2, 2002, 116 Stat. 1809, 1821; Pub.L. 109-92, §§ 5(c)(2), 6(b), Oct. 26, 2005, 119 Stat. 2100, 2102; Pub.L. 109-304, § 17(d)(3), Oct. 6, 2006, 120 Stat. 1707.)

18 U.S.C.A. § 924, 18 USCA § 924
Current through P.L. 114-221.

**End of Document**                                    © 2016 Thomson Reuters. No claim to original U.S. Government Works.

A-32

📒 KeyCite Yellow Flag - Negative Treatment
Proposed Legislation

United States Code Annotated
  Title 18. Crimes and Criminal Procedure (Refs & Annos)
    Part I. Crimes (Refs & Annos)
      Chapter 95. Racketeering (Refs & Annos)

18 U.S.C.A. § 1951

§ 1951. Interference with commerce by threats or violence

Currentness

**(a)** Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires so to do, or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of this section shall be fined under this title or imprisoned not more than twenty years, or both.

**(b)** As used in this section--

  **(1)** The term "robbery" means the unlawful taking or obtaining of personal property from the person or in the presence of another, against his will, by means of actual or threatened force, or violence, or fear of injury, immediate or future, to his person or property, or property in his custody or possession, or the person or property of a relative or member of his family or of anyone in his company at the time of the taking or obtaining.

  **(2)** The term "extortion" means the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right.

  **(3)** The term "commerce" means commerce within the District of Columbia, or any Territory or Possession of the United States; all commerce between any point in a State, Territory, Possession, or the District of Columbia and any point outside thereof; all commerce between points within the same State through any place outside such State; and all other commerce over which the United States has jurisdiction.

**(c)** This section shall not be construed to repeal, modify or affect section 17 of Title 15, sections 52, 101-115, 151-166 of Title 29 or sections 151-188 of Title 45.

**CREDIT(S)**
  (June 25, 1948, c. 645, 62 Stat. 793; Pub.L. 103-322, Title XXXIII, § 330016(1)(L), Sept. 13, 1994, 108 Stat. 2147.)

18 U.S.C.A. § 1951, 18 USCA § 1951
Current through P.L. 114-221.

End of Document      © 2016 Thomson Reuters. No claim to original U.S. Government Works.